(No. 65229.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANDREW KOKORALEIS, Appellant.

*Opinion filed October 25, 1989.—Rehearing denied December 4, 1989.*

236

238

Robert Agostinelli, Deputy Defender, and Peter A. Carusona and Verlin R. Meinz, Assistant Defenders, of the Office of the State Appellate Defender, of Ottawa,

for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen, Sally L. Dilgart and Michael J. Singer, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a jury trial in the circuit court of Du Page County, the defendant, Andrew Kokoraleis, was convicted of the murder and aggravated kidnapping of Lorraine Borowski. At a capital sentencing hearing requested by the State, the same jury determined that the defendant was eligible for the death penalty and that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The trial judge accordingly sentenced the defendant to death for the murder conviction; the judge later sentenced the defendant to an extended term of 30 years' imprisonment for the conviction for aggravated kidnapping. The defendant's execution was stayed pending direct review by this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d Rules 603, 609(a)).

At trial the State presented evidence of the victim's disappearance, the discovery and identification of her remains, and the defendant's oral and written confessions to her abduction and murder. Over objection, the State was also allowed to introduce evidence of the defendant's participation in two similar murders. The defendant testified in his own behalf at trial; he recanted his confessions, and he denied having had any part in the offenses charged here and in the other crimes in which the State attempted to implicate him.

The victim in this case, 21-year-old Lori Borowski, disappeared on Saturday, May 15, 1982. Lori was em-

ployed as a secretary in a real estate office in Elmhurst, and a neighbor saw her leave for work around 8:15 that morning. Lori's office was located about three blocks from her apartment, and she would walk to work. Lori's employer, Don Stibbe, arrived at the office between 8:45 and 9 o'clock on the morning of her disappearance. The office had not yet been opened, though Lori normally would have arrived by 8:30. Mr. Stibbe found some objects on the pavement in front of the office—shoes, keys, cosmetics, coins, and a hand tool, a nutdriver. Later that morning Mr. Stibbe reported Lori's disappearance to Elmhurst police. The shoes and keys found in front of the office were subsequently identified as Lori's.

Fredrick Moberley, who owned a store located in the same shopping plaza as the office where Lori was employed, arrived at work around 10 minutes to eight on the morning of Lori's disappearance. At that time Moberley saw a reddish-orange van parked in an area of the lot that normally was empty; he did not notice any shoes or other items in front of the real estate office, which was located about 50 feet from his own store. Shown a photograph of the van allegedly used in Lori's abduction, Moberley testified that the vehicle depicted was similar to the one he had seen in the parking lot on May 15, 1982.

The victim's skeletal remains were discovered on October 10, 1982, in a cemetery in Darien. The remains were found in an unused portion of the cemetery and were about 120 to 130 feet from a gravel road. The victim's neighbor identified the blouse and slacks present on the body as the same clothing the victim was wearing on the morning of her disappearance. The victim's blouse had been raised to armpit level, and her bra had been lowered. A purse was found some 30 feet away, and items of jewelry were found on or near the remains.

At trial the victim's mother, Mrs. Lorraine Mae Borowski, identified the purse and jewelry as Lori's.

Identification of the remains was made through the aid of dental records and X-rays, and a post-mortem examination was conducted by Frank Orlosky, professor of physical anthropology at Northern Illinois University. At trial, Professor Orlosky testified that when the remains were discovered skin covered the front surface of the victim's body, including the lower thoracic region, part of the abdominal region, and the right leg and part of the left leg. The navel and right nipple were present, but the left nipple was not; the skin ended about two inches below where the left nipple would have been. Professor Orlosky did not find any signs of trauma or evidence of animal tooth marks on any part of the skin, including the portion from the victim's chest area. He believed that there were several possible explanations for the absence of the left nipple, including decomposition, insect or other animal activity, and amputation. The post-mortem examination disclosed a number of bone injuries. Professor Orlosky found three frontal sites of trauma in the upper chest region. All three wounds were small and circular, and he believed that they were consistent with stab wounds from a sharp instrument, such as an ice pick. There were also frontal wounds on two lower vertebrae, but Professor Orlosky was unable to determine whether or not they had been caused by the same stabs that had produced the wounds in the victim's upper chest. Professor Orlosky found three separate wounds to the victim's back, which he believed could have been caused by either a knife or an ice-pick type of instrument. In addition to the injuries already described, Professor Orlosky found that the victim's nasal bone had been fractured.

The defendant was eventually arrested in connection with the abduction and murder of Lori Borowski. On Oc-

tober 20, 1982, Chicago police officers stopped a reddish-orange van that matched a description given to the police by a crime victim. The van was being driven by Edward Spreitzer and belonged to Robin Gecht. In a subsequent search, three knives were found in the back of the van. The inside handle on the back door was missing; according to the trial testimony, the door could be opened only by inserting a tool where the lock should have been, and the nutdriver found with Lori Borowski's keys and other effects in front of her office could have been used for that purpose.

Spreitzer and Gecht were arrested sometime later, and during the evening of November 7, 1982, Spreitzer led police officers to the defendant's home in Villa Park. The defendant returned that night with the officers to Area 5 headquarters in Chicago. The defendant was questioned that evening and the following two days. During that period the defendant confessed to the murder of Lori Borowski and to the murders of several other women.

The defendant gave law enforcement officers both oral and written statements concerning his role in the murder of Lori Borowski, and the defendant's confessions were introduced into evidence at his trial. Detectives Warren Wilkosz and John Sam of the Du Page County sheriff's office questioned the defendant about the Borowski murder two days after his arrest, on November 9. Detective Sam placed three photographs of Lori Borowski before the defendant and asked the defendant whether he could identify the person depicted in the photographs. At trial Wilkosz testified that the defendant responded, "That is the girl that Eddie Spreitzer and I killed in the cemetery." The defendant went on to say that one morning during the spring of 1982 he and Spreitzer were driving in Gecht's van on Route 83 in Elmhurst. They entered a parking lot, and

they saw Lori Borowski and forced her into the van. The defendant said that they then drove to a cemetery, where both he and Spreitzer beat and stabbed the victim. When Lori was dead, they dragged her body into some weeds. At the conclusion of the oral statement the defendant agreed to provide the officers with a written statement, which he then wrote out by hand, repeating in all pertinent respects the contents of his oral confession.

Over defense counsel's objection, the State presented evidence of the defendant's participation in two other murders: that of Linda Sutton in May 1981, and that of Shui Mak in May 1982. According to the trial evidence, 26-year-old Linda Sutton, who lived with her mother in Chicago, disappeared on the evening of May 23, 1981. Her body was found on June 1, 1981, in a field near the Brer Rabbit Motel, in an unincorporated area of Villa Park. The victim's hands were cuffed behind her back; her slacks and underpants had been pulled down to the knees, and her sweater and bra had been pulled up around her shoulders.

An autopsy was performed later that day by Dr. David Barrett, director of pathology at Central Du Page Hospital. The victim's breasts and anterior chest wall were absent, and several ribs were in disarray. Dr. Barrett found nicks or cuts on a number of the victim's ribs, which could have been caused by a sharp blade or object. Dr. Barrett concluded that the victim had died as a result of stab wounds and blood loss associated with stab wounds. Dr. Barrett testified that several years after he performed the autopsy he was asked to reconsider his original findings in light of certain statements that had been made concerning the victim's death. Dr. Barrett had originally attributed the absence of tissue in the victim's breast area to decomposition and animal activity. Later, however, Dr. Barrett was asked whether the

breast tissue could have been amputated prior to the victim's death. Although Dr. Barrett had not considered that possibility at the time of the autopsy, he concluded, based upon an examination of the autopsy photographs, that the condition of the body was "very consistent" with the hypothesis of breast amputation. Dr. Barrett explained that the chest wounds were symmetrical and ended abruptly, and he did not believe that animal activity would have caused tissue damage of that nature. According to Dr. Barrett, many different types of weapons could have been used to amputate the breasts, including a knife or a length of wire.

At trial, the State introduced into evidence a number of inculpatory statements made by the defendant concerning the Linda Sutton murder. The defendant's initial statement in that case was made to Chicago Police Detective Thomas Flynn, who interrogated the defendant soon after his arrest on November 7, 1982. Detective Flynn testified that the first murder mentioned by the defendant was that of a black woman, whom the defendant said he and Gecht had picked up in Gecht's van in Chicago. They took the victim to a lot behind the Brer Rabbit Motel in Villa Park, where they had sexual intercourse with the victim and then stabbed her several times. The defendant also said that Gecht took a piece of piano wire and used it to sever the victim's left breast. According to the defendant, Spreitzer was also present at that time.

The defendant later gave a more detailed account of Linda Sutton's murder to Robert Bastone, then an assistant State's Attorney in Cook County, and to Detective John Philbin. On this occasion the defendant said that in spring or early summer of 1981 he and Gecht were driving in Gecht's van on the near north side of Chicago, in the Rush Street area. The defendant, who was in the back of the van, heard Gecht speak with a

woman, who then entered the vehicle. They drove to the Brer Rabbit Motel in Villa Park, where they found Edward Spreitzer. Gecht ordered the victim to get out of the van, but she refused. At Gecht's request, the defendant and Spreitzer then pulled the victim from the van. Gecht struck the woman several times, and she fell to the ground. Gecht and Spreitzer then dragged her to a field behind the motel. The defendant said that he then returned to the van and sat in the front seat. According to the defendant, Gecht pulled the woman's slacks down and Spreitzer held her arms; Gecht lowered his own trousers and raped the victim. Afterwards, Gecht removed a homemade hatchet from the back of his pants and struck the woman three or four times in the chest. Gecht returned to the van a short time later. The defendant saw blood on Gecht's hands and on the hatchet. Gecht and the defendant left in the van, and Spreitzer drove away in his own car.

The defendant subsequently gave both oral and written statements concerning the murder of Linda Sutton to Detectives Wilkosz and Sam of the Du Page County sheriff's office. The defendant identified photographs of Linda Sutton as the woman who had been killed at the Brer Rabbit Motel in Villa Park. The defendant told the detectives that on May 23, 1981, he and Robin Gecht drove in Gecht's van to what the defendant said was a black neighborhood in Chicago. There, they forced the victim into the van and then drove to the Brer Rabbit Motel in Villa Park. The defendant said that Gecht took the victim into some bushes and raped her, and that Gecht later beat the victim with his fist in the head and shoulder area and struck her with an ax on the upper part of her body. Edward Spreitzer arrived, and Gecht and the defendant later returned to Gecht's home. The defendant subsequently provided a written statement concerning the murder of Linda Sutton. In that state-

ment, the defendant said that the victim had been picked up in the Rush Street area of Chicago. The defendant stated that he "watched in shock" as Gecht struck the victim with the ax, and that he "didn't know what was going on."

The State also presented evidence of the defendant's participation in the abduction and murder of 30-year-old Shui Mak in May 1982. The victim's sister, Mrs. Lin Mak Zuehsow, testified that around 1 a.m. on May 30, 1982, the family returned home to Lombard from the restaurant they operated in Streamwood. Mrs. Zuehsow was in one car with the parents, and Shui and a brother were in a second car. It appears that during the trip Shui got out of the car in which she was riding. Upon arriving home, Mrs. Zuehsow saw that Shui was missing; after speaking with her brother, Mrs. Zuehsow drove back to look for her sister but was unable to find her. The trial judge sustained a hearsay objection to the witness' testimony that she learned from her brother that Shui had exited the car following an argument.

Shui Mak's skeletal remains were found on September 30, 1982, in a wooded area near a new housing development in the northwest part of Cook County. The victim was clothed, but her sweater and the zipper on her slacks were both torn. A necklace found on the remains was identified as belonging to the victim. Dr. Eupil Choi, a pathologist employed by the Cook County medical examiner's office, performed an autopsy on October 1, 1982. Dr. Choi found multiple fractures of the victim's skull, which he attributed to trauma from a blunt instrument. Dr. Choi also found two superficial fractures of the sixth and seventh ribs on the left side, in the high stomach area, and a complete transection of the left forearm bone. The cause of death was blunt trauma to the head and fractures of the ribs. Dr. Choi said that he did not find evidence of stab wounds,

though he was unable to eliminate stabbing as a possible cause of the victim's rib injuries.

The defendant made an oral statement concerning the murder of Shui Mak to Assistant State's Attorney Bastone and Officer John Philbin, and this statement was also introduced into evidence at trial. The defendant told Bastone and Philbin that in late May or early June 1982 he and Edward Spreitzer were driving in Gecht's van somewhere in the western suburbs when they saw a woman walking alone. Spreitzer stopped the van and asked the woman if she needed a ride; the woman, whom the defendant described as "Oriental," accepted the offer. After driving for 10 or 15 minutes they stopped in a field, in an area where new houses were under construction. According to the defendant's statement, Spreitzer got out of the van and told the woman to get out, but she refused. The defendant and Spreitzer then pulled the woman from the van. Spreitzer hit the woman several times, and she fell against the side of the van. They dragged her body a short distance; Spreitzer then lifted the woman's sweater and stabbed her three or four times with a kitchen knife. The defendant said that he became ill and went back to the van. Spreitzer returned to the van a short time later, and the two drove off.

The defendant testified in his own behalf at trial. He explained that he had worked for Robin Gecht, an electrician, from the middle of 1981 until May 1982, and that he had also served as a live-in baby-sitter for Gecht's children. The defendant said that he met Spreitzer in 1978 or 1979. The defendant denied having any role in the Borowski, Sutton, and Mak murders, and he maintained that before talking to the investigating officers he had no knowledge of those crimes. The defendant insisted that he had been "framed" by the authorities, explaining that the officers had provided him with

various facts about the crimes and had then forced or induced him to repeat the information in his statements. The defendant asserted that on several occasions different officers promised him lenient treatment in exchange for statements implicating Gecht and Spreitzer in the murders and that the officers, at other times, struck him.

The defendant testified that following his arrest he was questioned until 5 o'clock the next morning, when he was finally permitted to sleep on four plastic chairs in the interrogation room. After a short nap, he was questioned again. The defendant said that he was struck sporadically from 1 o'clock until 4 o'clock during the afternoon of November 8. On one occasion a blanket was placed over his head and he was then hit several times. The defendant testified that during the afternoon questioning a number of law enforcement officers supplied him with information about the Borowski, Sutton, and Mak murders.

The defendant testified that around 4 o'clock that afternoon he accompanied a number of law enforcement officers to Schiller Woods, to point out to them the place where he had told them some bodies had been buried. The defendant testified that he gave that information to the officers so that they would stop hitting him. The defendant directed the officers to a clearing, where the officers gave him a shovel and told him to dig. Some time later, the police ordered the defendant to lie down in one of the holes. According to the defendant, the officers shoveled dirt on him. One of the officers then kneeled on his chest, pointed a pistol at him, and said to the others, "We should blow this man's head off." Two shots went off, but neither one hit the defendant.

The defendant testified that following the return to Area 5 headquarters that evening he was questioned until around midnight. The defendant said that he had not

eaten all day. That night he slept in the interrogation room while handcuffed to a ring in the wall. The next morning he was interrogated by detectives from the Du Page County sheriff's office. The defendant said that during this time he told the detectives that he was involved in another murder, that of a woman named Lorraine Bieze. In his testimony, the defendant acknowledged that he had previously been convicted in Cook County of four counts of murder, two counts of rape, and two counts of aggravated kidnapping.

Several other witnesses also testified in the defendant's behalf at trial. Robert Certone, manager of a liquor store located in the shopping plaza from which Lori Borowski was abducted, testified that he arrived at work between 8:20 and 8:35 on the morning of Lori's disappearance, May 15, 1982. From a distance of about 300 feet, Mr. Certone saw what appeared to be a fight between a man and woman; the woman was standing next to a silver or gray car and was waving her arms. The car was parked about two doors away from the real estate office where Lori worked.

Thomas Luehring, a suburban public official, testified that he entered the shopping plaza parking lot around 8 o'clock on the same morning, May 15, 1982. As Mr. Luehring was driving into the lot, he noticed a silver or off-white car coming toward him. The other car passed within several feet of Mr. Luehring, and the driver gave the witness an angry look. Mr. Luehring later saw Edward Spreitzer on a television newscast and, at that time, identified Spreitzer as the driver of the car. The witness said that he could not tell whether Spreitzer was alone in the vehicle.

Kathleen Daye, assistant manager of a hospital credit union in Elmhurst, testified that in mid-May 1982 she heard a report of a missing young woman in Elmhurst. Later that month, around May 29, a girl accosted Mrs.

Daye at a gas station and asked for a ride. Mrs. Daye told the girl that she was not going in the direction the girl mentioned. Mrs. Daye described the girl as 5 feet 4 inches to 5 feet 5 inches in height, with unkempt blond hair. She did not have a purse; she was carrying a loaf of bread in one hand and a flower in the other. Later that afternoon Mrs. Daye saw a sign in a laundromat describing a missing person, Lori Borowski; the sign also contained a photocopy of a black and white photograph of Lori. Believing that she had seen the same girl at the gas station, Mrs. Daye reported the information to the Elmhurst police department.

Also testifying as a witness in the defendant's behalf at trial was Dennis Kurzawa, a detective in the Du Page County sheriff's office. Kurzawa testified that on November 9, 1982, he went to Area 5 with Detective Wilkosz to question the defendant about a homicide, that of Lorraine Bieze. Kurzawa showed the defendant some photographs of Bieze, and the defendant said that the woman looked vaguely familiar to him. Based on the information the defendant gave the detective about the case, however, Kurzawa believed that the defendant was referring to a different homicide and that he had not been involved in the Bieze murder.

Defense counsel also presented testimony concerning the defendant's activities around the time of Linda Sutton's murder in May 1981. Nick Kokoraleis, one of the defendant's brothers, and Christina Martinez, the defendant's sister, testified that the family went to the cemetery to visit their mother's grave on the morning of Sunday, May 24, 1981, Memorial Day weekend. Linda Sutton had disappeared May 23. The family left the cemetery around 1 o'clock that afternoon. Nick Kokoraleis was unable to remember whether the defendant had spent the preceding night at the family's house, but Mrs. Martinez testified that she had seen the defendant at the

house around 4 or 6 o'clock the preceding afternoon and that the defendant arrived at the house around 9 or 9:30 on Sunday morning. Mrs. Martinez said that she did not notice anything unusual about the defendant on that day.

In rebuttal, the State presented testimony contradicting the defendant's claims of mistreatment at Area 5 headquarters and during the search for bodies in Schiller Woods. Following the close of evidence, the jury returned verdicts finding the defendant guilty of the murder and aggravated kidnapping of Lori Borowski. Judgment was entered on the verdicts. A capital sentencing hearing was subsequently held, and, as we shall discuss in more detail later in this opinion, the defendant was sentenced to death for the murder of Lori Borowski.

I

A

The defendant raises a number of allegations of trial error. The defendant first challenges the State's introduction at trial of evidence of his participation in other crimes. The defendant contends that the evidence was inadmissible in its entirety; that even if the full range of the other-crimes evidence was not inadmissible, those portions of the evidence concerning breast mutilation should have been excluded; and, finally, that the prosecution erred in presenting evidence of a case that the trial judge had earlier refused to admit, and in presenting additional information concerning the defendant's possible criminal activity.

The defendant first contends that the trial judge erred in allowing the State to introduce evidence of his participation in the Sutton and Mak murders. The trial judge initially excluded evidence of those crimes, as well as evidence of the defendant's participation in the murder of Rose Beck Davis in Chicago in September 1982.

On the State's motion for reconsideration, however, the trial judge subsequently decided to permit the State to introduce evidence concerning the Sutton and Mak murders; the judge adhered to his previous decision to bar evidence of the Davis murder. At trial, then, the State was permitted to present evidence in its case in chief of the defendant's participation in the murder of Linda Sutton in May 1981 and in the murder of Shui Mak in May 1982. Before this court, the defendant renews his contention that evidence of the Sutton and Mak murders should not have been introduced at trial.

Evidence of other crimes committed by a defendant is not admissible as proof of the defendant's propensity to commit crime. (*People v. McDonald* (1975), 62 Ill. 2d 448; McCormick, Evidence §190, at 557-58 (3d ed. 1984); M. Graham, Handbook of Illinois Evidence §404.5, at 162-63 (4th ed. 1984).) It is well established, however, that evidence of a defendant's participation in crimes other than the one for which he is standing trial may be admitted, in an appropriate case, if the evidence is offered for a purpose other than to establish propensity to commit crime. (*People v. Stewart* (1984), 105 Ill. 2d 22, 61-62; *People v. McKibbins* (1983), 96 Ill. 2d 176, 182; *People v. Lehman* (1955), 5 Ill. 2d 337, 342-43.) For example, evidence of other crimes may be offered to show *modus operandi*, presence, identity, motive, or intent. In the present case, the jury was instructed to consider the evidence of the defendant's participation in the murders of Linda Sutton and Shui Mak as relevant to the issues of "presence, intent, design, and knowledge."

As a preliminary matter, we note that the defendant makes no challenge to the manner by which the State established his participation in the Sutton and Mak murders. The bulk of the evidence of the defendant's role in the other crimes was supplied by the defendant's own inculpatory statements about those offenses, rather than

by the testimony of third-party witnesses, as is often the case. There is authority, however, that evidence of another crime may be presented through the introduction of the defendant's own confession to the offense as well as through the testimony of a third-party witness to the occurrence (see *Osborne v. State* (1963), 237 Ark. 5, 237 Ark. 170, 371 S.W.2d 518), and the defendant makes no claim that the manner of proof of the other offenses has any significance in this case.

Contrary to the defendant's argument, we believe that the circumstances of the Borowski, Sutton, and Mak murders demonstrated a distinct pattern, or *modus operandi*, and that evidence of the defendant's presence during the Sutton and Mak murders was therefore admissible as proof of the defendant's participation in the abduction and murder of Lori Borowski and his identity as one of her assailants. There were a number of distinctive factual similarities common to the Borowski, Sutton, and Mak murders. In each case the attackers used Robin Gecht's van, and in each case the victim, who was female and who was alone at the time, was taken from a public place to a secluded area, where she was beaten and stabbed. Also, in each case the victim's clothing was disturbed in a manner indicative of sexual attack, and there was no evidence of robbery. It may be noted that jewelry was found on the remains of both Lori Borowski and Shui Mak. Together, these features were sufficiently distinctive to earmark the attacks as crimes in which the defendant was involved. (See *People v. Kokoraleis* (1987), 154 Ill. App. 3d 519 (defendant's appeal from conviction for murder of Rose Beck Davis; rejects defendant's contention that trial court erred in permitting prosecution to introduce evidence of Sutton and Mak murders as having similar *modus operandi*).) There were substantial similarities among the three crimes, and these warranted admission of evidence of the

defendant's participation in the Sutton and Mak murders.

Besides sharing a core of facts indicative of a common criminal agency, the evidence of the defendant's confessions to the Sutton and Mak murders also tended to support the reliability and accuracy of the defendant's confession to the Borowski murder, and to undercut his claim that his confession to the crimes charged here was the product of police coercion. The defendant's admission of his participation in the Sutton and Mak murders tended to buttress the defendant's statement that he had taken part in the murder of Lori Borowski. It will be recalled that the defendant was questioned by law enforcement officers from three different agencies: the Cook County State's Attorney's office, the Chicago police department, and the Du Page County sheriff's office. The defendant made inculpatory statements at different times to personnel from the three agencies. At trial, however, the defendant recanted all his confessions, claiming that the law enforcement officers had supplied him with facts about the Borowski, Sutton, and Mak murders and had induced or coerced him into repeating the information. In these circumstances, the State's evidence that the defendant had voluntarily given statements in the Sutton and Mak cases at various times to different officers undermined the defendant's claim that his confession to the abduction and murder of Lori Borowski, the offenses charged here, was coerced and untrue.

The defendant next argues that even if the evidence of his role in the Sutton and Mak murders was admissible, the testimony concerning the possible breast mutilation of Linda Sutton should not have been introduced. In support of this argument, the defendant contends that the evidence was irrelevant and prejudicial because there was no competent evidence that the victim in this case,

Lori Borowski, had also suffered amputation of the breast.

We do not agree with the defendant that the evidence that Lori Borowski's breast was amputated was remote or speculative. Professor Orlosky, who conducted the post-mortem examination of the Borowski remains, testified that skin was present on portions of the front surface of the victim's body. Professor Orlosky said that the right nipple and navel were present but that the skin ended several inches below the area where the left nipple would have been. He did not find evidence of trauma on the skin, and he explained that there were several possible explanations for the absence of the left nipple, including amputation, decomposition, and insect or animal activity. Professor Orlosky also found several stab wounds to bones in the area of the victim's upper chest. At the time the victim's remains were recovered, her blouse had been raised and her bra had been lowered. The disarranged condition of the clothing found on each of the three victims was an indication of the occurrence of sexual attack. Evidence of breast mutilation was relevant in demonstrating the *modus operandi* employed by the victims' assailants and the brutality of their assault, and Professor Orlosky's testimony suggested a further similarity between the attack on Lori Borowski and the attack on Linda Sutton.

Apart from the testimony already discussed, the defendant complains of several additional instances in which the State introduced evidence that, the defendant alleges, improperly suggested his participation in other crimes. In this regard, the defendant first argues that a number of the State's witnesses were improperly allowed to testify that they had discussed with the defendant "other cases" or "unrelated cases" while he was in custody. We do not believe that the defendant was prejudiced by the officers' references to "other cases" or "un-

related cases" in their testimony describing their interrogation of the defendant. In light of the defendant's claim at trial that he had been struck and threatened while undergoing interrogation, it was appropriate for the State to attempt to account for the defendant's activities during that period. The references to "other" or "unrelated" cases accommodated that interest, without providing unnecessary and potentially prejudicial information about the subjects of the other periods of questioning.

The defendant next contends that the prosecutor erred in asking him, on cross-examination, how many homicides he had talked about during the initial session of interrogation following his arrest. Defense counsel did not object to the question, and the defendant replied that he had spoken to the officer about some 16 different cases. In response to further cross-examination, the defendant explained that the interrogating officer supplied him with information about the cases, that he was innocent of those crimes, and that he was not then subject to any coercion. We agree with the State that the inquiry was proper. The evidence tended to rebut the defendant's claim of coercion with respect to the detailed statements he later gave concerning the Borowski, Sutton, and Mak murders. By eliciting from the defendant the information that he had indeed acknowledged to authorities his participation in 16 different murders before the time he said he was beaten, the State was able to cast doubt on the defendant's claim that his statements were coerced.

The defendant also argues that he was prejudiced by the prosecutor's question on cross-examination whether he had told police officers that he, Gecht, and Spreitzer had engaged in intercourse with the chest cavities of victims after amputating the victims' breasts. Defense counsel objected to the question and moved for a mistrial, arguing that the question violated a ruling *in*

*limine* excluding evidence of cult activity allegedly committed by the defendant and his accomplices. The trial judge denied the defendant's motion for a mistrial, and stated that he would allow the question already asked but would not permit the State to inquire further on the subject. In response to the question, the defendant acknowledged having made the statement but explained that one of the officers had told it to him and had instructed him to repeat it.

Assuming that the question was improper, we do not believe that it denied the defendant a fair adjudication of his guilt or innocence. The question occurred during an extensive cross-examination, in the course of a lengthy trial. The State presented strong evidence of the defendant's role in the abduction and murder of Lori Borowski.

The defendant's final allegation pertaining to the introduction of evidence of other crimes concerns the prosecutor's inquiry, in cross-examination, regarding the defendant's confession to the September 1982 murder of Rose Beck Davis in Chicago. It will be recalled that although the trial judge permitted the State to introduce, as part of its case in chief, evidence of the murders of Linda Sutton and Shui Mak, the judge barred evidence of the Rose Beck Davis murder. In questioning the defendant about the confession to the Davis murder, the prosecutor asked the defendant whether the assistant State's Attorney who was present when the confession was made had informed him of certain facts of the case or had told him to repeat certain facts. In this way, the prosecutor reviewed with the defendant the contents of the entire statement. The jury thus learned that, according to the statement, the defendant, Robin Gecht, and Edward Spreitzer had abducted Mrs. Davis from a street in Chicago and had taken her to a nearby gangway, where she was then beaten, raped, violated with an ax handle, and stabbed. The defendant argues that the

prosecutor's cross-examination concerning his statement about the Davis murder improperly introduced prejudicial material in violation of the trial judge's pretrial order excluding that evidence.

Defense counsel did not object to the line of questioning, however, and therefore failed to preserve for purposes of appeal any error in this regard. Moreover, the defendant himself first interjected the Davis murder into evidence in this case. During direct examination, the defendant described in detail the periods during which he was interrogated. As part of that testimony, the defendant stated that the police had struck him and had coerced him into making an untrue confession to the Davis murder. The defendant thus opened the door to the prosecution's inquiry concerning the Davis murder. On cross-examination, then, the prosecutor properly asked the defendant whether his description of the case was accurate or inaccurate.

B

The defendant next contends that he was denied his constitutional right of confrontation (U.S. Const., amends. VI, XIV) by the trial testimony of police officers who stated that accomplice Edward Spreitzer had implicated the defendant in the commission of unspecified offenses. In this regard, the defendant cites three instances of testimony. In describing the events leading to the defendant's arrest, a police detective testified that during the evening of November 7, 1982, he was informed by a second officer that Spreitzer "was now implicating another party by the name of Andy Kokoraleis"; the detective also testified that at the outset of his initial interrogation of the defendant, he told the defendant that he "was being implicated in murders with Spreitzer and by Spreitzer." The second officer, who also testified at trial, provided similar testimony regarding

the decision to arrest the defendant, stating that Spreitzer had "implicated" the defendant. Edward Spreitzer did not testify at trial, and the defendant contends that the officers' statements denied him his constitutional right to confront his accuser, Spreitzer.

Any error in this regard was, we believe, harmless. The same information was introduced into evidence by defense counsel, who elicited similar testimony from a number of witnesses, including the defendant himself. For example, the defendant testified on direct examination that he was told by one of the arresting officers that Robin Gecht and Edward Spreitzer had said that he had committed a number of murders with them. Defense counsel asked similar questions of law enforcement officers on cross-examination.

Defense counsel did not object to the three instances of testimony described above, though he did make an objection on another occasion to similar testimony from another witness. The State suggests that counsel's general failure to object—and indeed, his presentation of the same information through his own questioning of witnesses—demonstrates that counsel viewed the information as consistent with the defense theory of the case. We agree. That the State's witnesses claimed that Spreitzer and Gecht had implicated the defendant was entirely consistent with the defense theory, as developed at trial, that the defendant maintained that he had been framed by the authorities. It may be noted that later, in his presentence report, the defendant specifically claimed that Spreitzer had been involved in the plan and had aided the police.

In a footnote in the defendant's brief, appellate counsel contends that trial counsel's failure to register objections to the statements constituted ineffective assistance of counsel. As we have seen, however, counsel's failure to object was consistent with the defense theory at trial

that the defendant had been framed by the authorities, and by the alleged accomplices, and that the defendant's statements regarding the offenses charged here, as well as the Sutton and Mak murders, were not truthful. Accordingly, we do not believe that the defendant was prejudiced by counsel's failure to register objections to the testimony.

## C

In his final challenge to the trial proceedings, the defendant contends that he was denied a fair trial because the prosecutor improperly asked him, in cross-examination, to comment on the veracity of a number of adverse witnesses. The defendant makes the related contention that trial counsel was ineffective in failing to make any objection to the prosecutor's cross-examination.

Specifically, the defendant takes issue with the prosecutor's questions whether certain State witnesses were lying when they testified in a manner contrary to the defendant's version of events. The defendant correctly observes that it is generally improper to ask a witness on cross-examination whether an adverse witness' testimony is truthful. (See *United States v. Richter* (2d Cir. 1987), 826 F.2d 206; *People v. Riley* (1978), 63 Ill. App. 3d 176, 184-85; *People v. Graves* (1978), 61 Ill. App. 3d 732, 746-47; *People v. Hicks* (1971), 133 Ill. App. 2d 424, 433-34.) Questions of credibility are to be resolved by the trier of fact. (See *People v. Long* (1950), 407 Ill. 210, 211-12.) In the present appeal, the State does not contend that cross-examination of this nature should normally be allowed but instead suggests that in the present case it was invited by the defendant's theory of the case, and that the prosecution therefore did not act improperly in asking the defendant to comment on the veracity of the opposing witnesses.

As we have seen, it was the defendant's theory at trial that the police had furnished him with information regarding the Borowski, Sutton, and Mak murders and that he had merely repeated that information in making his oral and written statements. The defendant also asserted at trial that his cooperation was both induced by promises of lenient treatment and coerced by mistreatment. There is authority approving cross-examination of this nature following testimony by a defendant on direct examination that he was coerced into repeating inculpatory statements furnished to him by the authorities. (See *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 440 (no plain error in cross-examination of defendant that included questions whether law enforcement officers lied in trial testimony concerning defendant's confession; inquiry was within scope of defendant's own testimony on direct examination alleging police conspiracy in forcing him to make untrue confession); see also *People v. Turner* (1989), 128 Ill. 2d 540, 555-58 (defendant asked during cross-examination to comment on conflicting testimony of State's witnesses).) Such could be the case here, for the defendant maintained in his testimony that the police had "framed" him by providing him with information about the murders and causing him to repeat those facts in his statements. That portion of the cross-examination eliciting the defendant's comments on the veracity of adverse witnesses, while generally disapproved, was not necessarily inappropriate in the circumstances present in this case.

Assuming, however, that this aspect of the prosecutor's cross-examination was not proper, we must reject the defendant's argument that trial counsel was ineffective because he failed to object to it. Errors of this nature are amenable to correction, and a prompt objection to such cross-examination will normally be sufficient to prevent prejudice; counsel's failure to register an ob-

jection to this line of cross-examination may be construed as an indication that defense counsel did not consider the matter "to be of critical importance." (*People v. Hill* (1978), 58 Ill. App. 3d 822, 827.) The defendant contradicted the State's witnesses in numerous respects, and the jury was well aware that credibility was the dispositive issue. The evidence of the defendant's guilt was strong. We do not believe that the defendant was prejudiced by any error in this regard. (See *People v. Best* (1981), 97 Ill. App. 3d 1083, 1086-87; *People v. Cohen* (1980), 83 Ill. App. 3d 706, 708.) Accordingly, we do not consider that defense counsel was ineffective for failing to object to the inquiry.

The defendant argues that the prosecutor's alleged misconduct was aggravated by his later argument to the jury, when he told the jurors that they would have to decide whether the defendant or the State's witnesses were lying, and that the defendant was guilty if the assistant State's Attorney who took several of the defendant's statements was not lying.

The comments cited by the defendant were made in rebuttal argument and were not improper here. Defense counsel made similar statements in his own argument. Counsel told the jury that the State's witnesses testified that the defendant had made the inculpatory statements because the prosecution had no other evidence of the defendant's guilt; counsel noted the absence of eyewitnesses and the dearth of physical evidence. Counsel thus suggested that the State's witnesses were lying. It was not improper for the prosecutor to respond in kind. See *People v. Jones* (1982), 108 Ill. App. 3d 880, 888-89 (approving prosecutor's argument that jury could believe defense witnesses only by finding that State's witnesses lied, on record showing that defendant had interjected issue into case).

Having found no reversible error in the trial proceedings, we affirm the defendant's convictions for murder and aggravated kidnapping.

## II

Following the trial court's entry of judgment on the defendant's convictions for murder and aggravated kidnapping, the State requested a death penalty hearing. The hearing commenced on March 19, 1987. At the first stage of the sentencing hearing, the State introduced into evidence a certified copy of the defendant's birth certificate, showing a birthdate of July 18, 1963, a certified statement of the defendant's conviction on March 18, 1985, in Cook County on four counts of murder, two counts of rape, and two counts of aggravated kidnapping in the Rose Beck Davis case, and a certified statement of the defendant's convictions for murder and aggravated kidnapping in the present proceeding. The jury found the defendant eligible for the death penalty.

At the second stage of the death penalty hearing, the State presented evidence of the defendant's role in the abduction and murder of 30-year-old Rose Beck Davis. Mrs. Davis was employed by a Chicago-area business in marketing and sales, and during the evening of September 7, 1982, she was in the Loop with a client. Mrs. Davis last spoke with her husband around 10:30 that night, when she called to tell him when she would be home.

Mrs. Davis' body was found the next morning, September 8, in a gangway between two buildings on North Lake Shore Drive in Chicago. According to police officers who were called to the scene, a black sock or stocking was tied tightly around the victim's neck, and there was a similar ligature on one of her arms. The victim was lying on her back. Her sweater was raised and her bra had been ripped off; there were two or three slash

wounds across the victim's breasts. Also, her slacks and underpants were around her ankles. There was blood in the vaginal area. The victim's face was covered with blood, and blood had been spattered on the side of the building next to where the victim was found.

Dr. Robert Stein, chief medical examiner of Cook County, performed an autopsy on Rose Beck Davis on September 9, 1982. His external examination revealed a variety of injuries. Dr. Stein found ligatures knotted around the victim's neck and around one of her wrists. The victim's face was badly swollen from blunt trauma, and her nose was disfigured from comminuted fractures. Dr. Stein found a puncture wound in the lower part of her neck. There were two extensive slash wounds across the victim's chest from the armpits inward, across each breast. There were also three contusions below the navel, and contusions and abrasions on her back and wrist. An internal examination revealed the presence of a four-inch-long piece of wood in the victim's vaginal area; the wood perforated the vagina and entered the abdominal cavity. According to Dr. Stein, the evidence established that the victim had been beaten, stabbed, strangled, and impaled with an object.

Evidence of the defendant's oral and written statements concerning the Rose Beck Davis murder was introduced at the sentencing hearing through the testimony of Assistant State's Attorney Robert Bastone. Bastone testified that he first questioned the defendant about that case sometime around noon on November 8, 1982, at Area 5 headquarters. A police sergeant was also present during the interrogation. The defendant explained that about two months earlier, he, Gecht, and Spreitzer were in Gecht's van near Rush Street on the north side of Chicago when they saw a white woman walking alone. The defendant and Spreitzer ran up to the woman, grabbed her by the arms, and forced her

into the van. The van drove off; the defendant said that he put handcuffs on the victim while Spreitzer gagged her. When the van stopped, the three men dragged the woman to a gangway. Gecht hit the victim three or four times in the face, and she fell to the ground. The defendant then pulled the victim's slacks down, and Gecht pushed her blouse up around her arms and raped her. According to the defendant, Gecht later struck the victim in the face with a hatchet and forced the handle of the hatchet into the woman's vagina. The defendant said that while acting at Gecht's direction he took a knife and "poked at her midsection three or four times." The defendant told Bastone that he then dropped the knife and fell against the wall of the building. The defendant returned to the van after several minutes, and he, Gecht, and Spreitzer later drove off.

Assistant State's Attorney Bastone testified further that during the evening the defendant agreed to repeat his statement to a court reporter. After the statement was transcribed, Bastone reviewed it with the defendant, who made a number of corrections and then signed the document. Bastone read the statement to the jury; it was substantially the same as the earlier, oral statement. In the transcribed statement, the defendant said that Gecht removed the handcuffs from the victim after she was dead.

Defense counsel presented evidence in mitigation during the second stage of the capital sentencing hearing. James Cornwell, 30 years old, a chaplain at the Cook County jail, testified that he met the defendant 3½ to 4 years earlier, when the defendant was an inmate of the jail. Cornwell estimated that he saw the defendant about 100 times during the two-year period that the defendant was there. He found the defendant to be helpful, and he never felt threatened by him. Cornwell said that he believes the defendant can be rehabilitated. Cornwell said

that he and the defendant had corresponded since the defendant left Cook County jail.

Cyril Luckman, a retired college biology professor, testified that during the preceding 15 years he had been active in providing religious counseling to prisoners at the Du Page County jail. Luckman said that he met the defendant at the jail, where the defendant had been staying for about a year. Luckman said that during that time he had probably met with the defendant about 50 times. Luckman testified that he never felt threatened by the defendant and does not believe that the defendant is a danger to society.

Additional testimony in mitigation was provided by Rosalie Morris, the mother of a former girlfriend of the defendant. Mrs. Morris met the defendant in December 1980, when the defendant was dating her daughter, who was then 14 years old. Mrs. Morris testified that her daughter later ran away from home and that her daughter subsequently explained that she had been persuaded to return home by the defendant. Mrs. Morris explained that she and the defendant had ended up corresponding with each other after she intercepted a letter that he had written to her daughter following his arrest in November 1982. Mrs. Morris said that she had visited the defendant at the Cook County and Du Page County jails.

The defendant also testified at the second stage of the sentencing hearing. He described his involvement in religious activities in jail and prison following his arrest in November 1982 in connection with the present charges. The defendant denied having any part in the Borowski, Sutton, Mak, and Davis murders, asserting, in conformity with his trial testimony, that he had been "framed" by the authorities.

At the conclusion of the sentencing hearing, the jury returned a verdict finding that there were no mitigating circumstances sufficient to preclude a sentence of death.

The trial judge accordingly sentenced the defendant to death for the murder of Lori Borowski. At a subsequent hearing, the trial judge denied the defendant's post-trial motion and imposed an extended term of 30 years' imprisonment for the defendant's conviction for the aggravated kidnapping of Lori Borowski.

A

The defendant challenges his death sentence on a number of grounds. The defendant's first contention relates to the manner in which the State established one of the statutory aggravating circumstances, and with that the defendant's eligibility for the death penalty. In the present case, a bifurcated sentencing hearing was conducted. During the first stage of the hearing the State sought to prove the existence of two of the statutory aggravating circumstances contained in section 9—1(b) of the Criminal Code of 1961: that the defendant had been convicted of murdering two or more persons, and that the present murder occurred in the course of a specified felony. (See Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(b)(3), (b)(6).) To prove the defendant's commission of multiple murders under the first circumstance, the State introduced into evidence certified statements of the defendant's convictions in the present case and in the Rose Beck Davis case. The defendant argues that the exhibit setting forth his convictions in the Davis case was prejudicial in two respects: first, because it described multiple convictions for a single murder, and, second, because it referred to his convictions for rape and aggravated kidnapping. The defendant contends that the information was irrelevant to the issue of his eligibility for the death penalty and that its presentation during the first stage of the sentencing hearing could only have confused the jurors.

During the sentencing hearing, defense counsel asked the trial judge to advise the jurors that the multiple murder convictions referred to in the Cook County judgment involved only one victim. The trial judge responded that counsel could make that statement to the jurors. Defense counsel did so in argument at the conclusion of the first stage of the sentencing hearing, telling the jurors:

> "Ladies and gentlemen, when you view that certified copy of conviction, while there are several counts of murder in the legal provisions, you are allowed to plead things in the alternative.
>
> What we are talking about here is the death of Rose Beck Davis. There was [sic] not two murders, three murders or four murders. The certified conviction and murder conviction relates to one person and that is the murder of Rose Beck Davis."

Before this court the defendant maintains that trial counsel's admonition to the jurors was insufficient because closing arguments are not evidence and thus could not have corrected the false impression the defendant claims to have arisen from the statement of conviction.

The defendant correctly observes that the multiple convictions for murder in the Davis case were redundant and that only one conviction should have been entered for the killing. (See *People v. Lego* (1987), 116 Ill. 2d 323, 344; *People v. Szabo* (1983), 94 Ill. 2d 327, 350; *People v. King* (1977), 66 Ill. 2d 551, 566.) But we do not believe that the defendant could have suffered any prejudice by the admission into evidence of the statement of conviction in the Davis case. The multiple-murder aggravating circumstance of section 9—1(b)(3) requires that a defendant have been convicted of murdering two or more persons. That was unquestionably proved here. The sentencing jury had found the defendant guilty of the murder of the victim in the present case, Lori Borowski; whether the defendant was guilty of only one other mur-

der or of several other murders could not have affected the jury's determination that he had been convicted of at least two such offenses and that the multiple-murder circumstance therefore was established. As we have seen, defense counsel made no challenge to the evidence of the defendant's prior conviction in Cook County for the murder of Mrs. Davis. Rather, counsel acknowledged the conviction and attempted only to explain to the jury that the prior case involved one victim rather than multiple victims.

Moreover, defense counsel was permitted to explain to the jurors at the sentencing hearing that the defendant's multiple convictions in the Cook County case arose from the murder of one person, and the prosecution did not suggest otherwise. In opening statement at the first stage of the sentencing hearing, the prosecutor told the jury that the multiple-murder circumstance was applicable in this case because of the defendant's prior conviction for the murder of Rose Beck Davis; there was no suggestion that the defendant had been convicted of other murders, apart from his conviction in the present case. Thus, nothing in the record supports the defendant's contention that the jury may have been confused by the multiple convictions. See *Lego*, 116 Ill. 2d at 344-45; *cf. People v. Holman* (1984), 103 Ill. 2d 133, 167-68.

The certified statement of conviction in the Davis case referred not only to the defendant's convictions for murder but also to his convictions on two counts of rape and two counts of aggravated kidnapping. The defendant argues that the convictions for the felonies of rape and aggravated kidnapping were irrelevant at the first stage of the sentencing hearing and that the information regarding the felonies in the Davis case could only have misled the jurors as they attempted to apply the felony murder aggravating circumstance to the facts of the Borowski case. We note that although defense counsel

sought to clarify for the jurors the nature of the defend-
ant's murder convictions in the Davis case, counsel did
not similarly object to the evidence of the defendant's
convictions in Cook County on the other felonies.

The purpose of the first stage of a death penalty
hearing is to permit the trier of fact to determine
whether the defendant is eligible to receive the death
penalty. (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(g), (h).)
While the information regarding the additional offenses
was extraneous to that inquiry, we do not believe that
the defendant was prejudiced by its introduction into evi-
dence. The prosecution referred only to the defendant's
age in arguing for the eligibility determination, and no
attempt was made to inflame the jury with the knowl-
edge of the additional offenses. In analogous circum-
stances we have not found reversible error to occur in
the use of a unitary, or one-stage, capital sentencing
hearing, in which evidence of nonstatutory aggravating
circumstances is introduced prior to a determination of
the defendant's death penalty eligibility. In those cases
we have rejected the argument that prejudice necessarily
obtains when the sentencing authority is apprised of
nonstatutory aggravating evidence before making a find-
ing of death eligibility. (See *People v. Thompkins* (1988),
121 Ill. 2d 401, 448-50 (unitary sentencing hearing held
before trial judge; defendant not prejudiced in eligibility
determination by introduction of nonstatutory aggravat-
ing evidence of prior conviction for attempted murder
and subsequent death of victim); *People v. Lego* (1987),
116 Ill. 2d 323, 343-44 (unitary sentencing hearing held
before jury—nonstatutory aggravating evidence of prior
convictions for automobile larceny, armed robbery, va-
grancy, jail-breaking and robbery); *People v. Del Vecchio*
(1985) 105 Ill. 2d 414, 431-32 (unitary sentencing hearing
held before jury—nonstatutory aggravating evidence of
prior convictions for armed robbery and attempted

armed robbery).) The defendant makes no allegation that the jury was actually confused by the information regarding his convictions for the rape and aggravated kidnapping of Mrs. Davis, and we decline to presume that the defendant was prejudiced by the presentation of that information.

B

The defendant next argues that the jury instructions setting forth the felony murder circumstance did not state the applicable law. The defendant makes the additional argument that the evidence in the present case would not have supported a finding of death eligibility under the applicable law. Trial counsel made no objection to the instructions; the defendant contends that the failure to provide the jury with the proper instructions was plain error and that counsel's failure to object to the instructions constituted ineffective assistance.

In the present case, the jury's finding of death eligibility was in the disjunctive. The verdict form returned by the jurors stated that the jury had found, beyond a reasonable doubt, the existence of the multiple-murder aggravating circumstance of section 9—1(b)(3) "or" the existence of the felony murder aggravating circumstance of section 9—1(b)(6). Had the verdict form been phrased in the conjunctive, we could now assume that the jury had found both circumstances to exist. In a proper case, a reviewing court may infer from a conjunctive finding that the defendant's eligibility was indeed premised on at least one valid aggravating circumstance. (See *People v. Coleman* (1989), 129 Ill. 2d 321, 342-47; *People v. Odle* (1988), 128 Ill. 2d 111, 144-47 (Miller, J., specially concurring).) Because we are unable to rely on that assumption in the present case, we must examine the defendant's challenge to the allegedly improper aggravating circumstance.

Before July 1, 1982, the felony murder aggravating circumstance of section 9—1(b)(6) required that a defendant himself have inflicted the fatal injury (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)); that provision was amended effective July 1, 1982, to permit imposition of the death penalty on one who inflicted injuries contemporaneously with those causing death. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6).) The jury in the present case, however, was instructed under the latter provision, which did not take effect until after the murder charged here. The defendant argues that under the evidence in this case not even a properly instructed jury could have found him eligible for the death penalty on that ground, and that use of the felony murder aggravating circumstance resulted in an impermissible double enhancement in this case. In any event, the defendant asserts that a new sentencing hearing is necessary because the jury was not properly instructed on the felony murder aggravating circumstance. The defendant's first argument rests, of course, on the premise that the version of the death penalty statute in effect at the time of the offense provides the governing law for our purposes here. In this regard, the defendant notes that the legislation amending section 9—1(b)(6) took effect on July 1, 1982, after the occurrence in this case. The defendant concludes that the legislature did not intend for the amendatory act to have retroactive effect. The defendant also suggests that retroactive application of the amended provision would violate the Federal and State constitutional prohibitions of *ex post facto* legislation. See U.S. Const., art. I, §10, cl. 1; Ill. Const. 1970, art. I, §16.

Assuming that prior law governed the present case and that the jury was not correctly instructed on the felony murder aggravating circumstance, we do not consider the failure to provide the correct instruction to be

plain error, or that defense counsel was ineffective in failing to object and to offer the correct instructions.

To establish ineffective assistance of counsel, a defendant must generally establish both that counsel's performance was deficient and that the deficiency resulted in prejudice to the defendant. (See *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504.) We are unable to conclude here that the defendant was prejudiced in this regard. To establish actual prejudice resulting from a deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland,* 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We do not believe that counsel's failure to offer what are asserted to be the correct jury instructions on the felony murder circumstance undermined the reliability of the eligibility determination. As we have discussed, the jury was also instructed on the multiple-murder circumstance, and the defendant does not challenge the accuracy of those instructions or his eligibility under that circumstance. As we noted earlier, the defendant undeniably had been convicted of the murders of two or more persons, rendering him eligible for the death penalty, and he makes no challenge to that proof. Although the jury's finding of eligibility was phrased in the disjunctive, we are certain that the multiple-murder circumstance was established here. The sentencing jury in the present case was the same body that found the defendant guilty of the murder of Lori Borowski. The sentencing jury also received uncontested proof of the defendant's conviction for the murder of Rose Beck Davis in Cook County. Given the unchallenged evidence that the defendant was

eligible for the death penalty because of his commission of multiple murders, we cannot say that our confidence in the reliability of the jury's eligibility determination is undermined by the failure to provide the jury with what we have assumed to be the correct statement of the felony murder aggravating circumstance. Accordingly, we do not believe that counsel was ineffective in this regard.

Although we have concluded that the jury would have found the existence of at least one other valid aggravating circumstance rendering the defendant eligible for the death penalty—the multiple-murder circumstance of section 9—1(b)(3) of the Criminal Code—we shall also briefly address the defendant's remaining contentions with respect to the felony murder circumstance. The defendant first argues that not even a properly instructed jury could have found the existence of that version of the felony murder aggravating circumstance of section 9—1(b)(6) in effect at the time of the offense in this case. The defendant believes that the evidence presented at trial failed to establish, beyond a reasonable doubt, that it was he and not Spreitzer who inflicted the fatal injury on the victim. We do not agree.

Professor Orlosky's post-mortem examination of Lori Borowski's remains showed that the victim had sustained multiple stab wounds in her chest area. The defendant, in his statement to the police, claimed responsibility for the murder: he identified Lori Borowski as the girl that he and Spreitzer had killed in a cemetery, and said that both he and Spreitzer beat and stabbed the victim. On this record, we consider that the evidence was sufficient to establish that the defendant himself committed the murder. *Cf. People v. Hargis* (1983), 118 Ill. App. 3d 1064 (vacating sentence of natural life imprisonment, predicated on felony murder aggravating circumstance, where evidence did not establish which of two codefendants administered fatal stab wound).

The defendant also contends that reliance on the felony murder provision of section 9—1(b)(6) resulted in an impermissible double enhancement. The defendant was convicted of both murder and aggravated kidnapping; in its original form, the aggravated kidnapping charge alleged the defendant's kidnapping of the victim and his infliction of great bodily harm and rape. Before trial, however, the State amended the charge by deleting the allegation of rape, and the charge on which the defend-ant was convicted alleged only the defendant's infliction of great bodily harm. The defendant argues that the act of bodily harm constituting the basis for the aggravated kidnapping charge was the same bodily harm that caused the victim's death. Relying on *People v. Hobbs* (1981), 86 Ill. 2d 242, the defendant concludes that the combination of aggravated kidnapping and murder in the felony murder circumstances results in an impermissible double enhancement. Both the original and amended versions of the felony murder aggravating circumstance include aggravated kidnapping, but not kidnapping, as one of the enumerated felonies.

We considered the same argument recently in *People v. Phillips* (1989), 127 Ill. 2d 499. In that case the defendant contended that an improper double enhancement occurred upon his conviction for aggravated kidnapping and the imposition of the death penalty, premised on section 9—1(b)(6), murder occurring in the course of the commission of a specified felony. We rejected the defendant's argument, holding that it could not be said that the same act committed by the defendant constituted the basis for both the conviction for aggravated kidnapping and the death sentence. In *Phillips* we noted the extensive injuries committed against the victim in that case, as detailed by the autoptic evidence. We concluded:

"As we noted above, the record would support a finding of aggravated kidnapping without utilization of those acts which caused death. We are not here confronted with a situation in which a single solitary act constituted both the sole action causing death and the single activity which raised a kidnapping to aggravated kidnapping and therefore offer no comment upon application of the death penalty in such a circumstance." (*Phillips*, 127 Ill. 2d at 540-41.)

As in *Phillips*, the evidence in the present case supports the conclusion that the victim suffered multiple acts of physical harm, and that there was not a necessary identity between the acts causing death and the acts constituting the physical harm that was an element of the aggravated kidnapping.

## C

The defendant next contends that the trial judge erred in denying a defense request, made during the second stage of the sentencing hearing, to permit the defendant to address the jurors without being placed under oath and without being subject to cross-examination. The defendant acknowledges that prior decisions of this court have held that there is no right, either statutory or constitutional, to allocution at a death penalty hearing. (See *People v. Christiansen* (1987), 116 Ill. 2d 96, 127-29; *People v. Gaines* (1981), 88 Ill. 2d 342, 374-80; see also *People v. Perez* (1985), 108 Ill. 2d 70, 88-89 (upholding trial court's refusal to admit at second stage of capital sentencing hearing defendant's sworn affidavit recounting past difficulties and expressing hope to lead normal life); *People v. Szabo* (1986), 113 Ill. 2d 83, 95 (upholding trial court's denial of defense motion *in limine* seeking to prohibit prosecution from cross-examining defendant regarding offenses at second stage of capital sentencing hearing).) The defendant asks that we

reconsider those holdings, and in support of his argument he offers several points that, he declares, we have not previously considered.

The failure to provide a defendant the opportunity to make a statement before being sentenced is not a constitutional deprivation. (*Gaines*, 88 Ill. 2d at 377-78, quoting *Hill v. United States* (1962), 368 U.S. 424, 428-29, 7 L. Ed. 2d 417, 421-22, 82 S. Ct. 468, 471-72.) Moreover, forbidding allocution in capital proceedings, while allowing it in noncapital proceedings (see Ill. Rev. Stat. 1981, ch. 38, par. 1005—4—1(a)(5)), does not deny capital defendants equal protection. (*Christiansen*, 116 Ill. 2d at 128-29; *Gaines*, 88 Ill. 2d at 379-80.) And we have previously held that the constitutional right to present mitigating evidence at a capital sentencing hearing (see, *e.g.*, *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669) is not violated by the denial of a defendant's motion to restrict the prosecutor's cross-examination of him at the hearing. (*Szabo*, 113 Ill. 2d at 95.) We do not agree with the defendant's suggestion that the refusal to permit allocution is difficult to justify in light of the admissibility of hearsay at capital sentencing hearings. While it is true that hearsay testimony is admissible, the witness who provides it is under oath and subject to cross-examination, unlike a party making an address in allocution. We have previously noted the inconsistency between such a practice and the trial-type procedures that govern a capital sentencing hearing. *Gaines*, 88 Ill. 2d at 380.

We note the recent decision of the New Jersey Supreme Court in *State v. Zola* (1988), 112 N.J. 384, 548 A.2d 1022, allowing defendants in capital sentencing hearings in that State to make a brief, unsworn plea for leniency without being subject to cross-examination. The New Jersey Supreme Court expressly disclaimed any Federal or State constitutional grounds for the decision,

basing it instead on the court's own supervisory authority. We decline at this time to adopt a similar rule for Illinois. Defense counsel, of course, may make a request for mercy in argument at the sentencing hearing. See *People v. Caballero* (1989), 126 Ill. 2d 248, 274-75.

## D

The defendant next challenges certain portions of the State's closing argument at the second stage of the death penalty hearing. The defendant complains that the prosecutors misstated the law and the evidence, improperly appealed to the emotions of the jurors, and expressed their personal opinions of the merits of the case. The defendant acknowledges that trial counsel did not object to a large number of the remarks now complained of, and the defendant makes the further contention that counsel was ineffective for failing to register a timely objection to those portions of the argument. The defendant has separated the challenged remarks into groups on the basis of the error alleged, and we shall consider them here in the same manner.

The defendant first asserts that the prosecutors misstated the evidence during their argument at the conclusion of the second stage of the sentencing hearing. The defendant complains of the following remarks made by the prosecutor in summation: that the victim in this case, Lori Borowski, had been "abducted, raped, tortured, beaten, stabbed"; that the defendant had "butchered and murdered" Lori Borowski, Linda Sutton, and Shui Mak; that Linda Sutton had suffered the removal of both her breasts; that Lori Borowski, Linda Sutton, Shui Mak, and Rose Beck Davis had been "beaten strangled, stabbed, and mutilated"; and that the defendant had personally taken part in the amputation of breasts. The defendant also complains that the prosecutor misstated the evidence in his rebuttal argument when he told the

jurors that numerous women had been "dragged off the street, murdered, mutilated, tortured, raped," and when he repeated his earlier statements that Linda Sutton's breasts had been cut off and that the defendant had taken part in amputating breasts. The defendant argues that the quoted comments misstated the evidence presented at trial and at the sentencing hearing.

We do not agree. We believe that the comments quoted above were, in general, supported by the evidence presented in this case. The trial judge sustained a defense objection to the statement that Lori Borowski had been raped. The other comments, however, were accurate summaries of the evidence and of fair inferences from the evidence. The testimony showed that the victims had been brutally assaulted and murdered. There was also evidence that Linda Sutton had suffered the removal of her breasts, an act that occurred in the defendant's presence, and for which he could be accountable. We do not believe that the statements excerpted above were unsupported by the evidence or by fair inferences drawn from that evidence.

The defendant next contends that the prosecutors improperly expressed their personal opinions of the merits of the case. Specifically, the defendant complains of the following statements by the prosecution during argument in rebuttal: "If this is not the case for the death penalty, it does not exist. It does not exist. No case could be more aggravating. No case could be less filled with mitigation"; "If [a situation where the jurors could sign the death verdict] isn't in this case, it isn't in any case"; the defendant "has committed some of the most brutal and heinous crimes imaginable"; and the defendant "is every woman's nightmare."

An objection to the last remark was overruled; defense counsel did not object to the other comments now challenged. "Any error related to *** comments to

which no objections were made would normally be considered waived unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." (*People v. Albanese* (1984), 104 Ill. 2d 504, 518.) We do not consider the remarks challenged in this case to be similar to those criticized in *People v. Yates* (1983), 98 Ill. 2d 502, 538-39, cited by the defendant. In *Yates* the prosecutor told the jurors, in his opening statement at the death penalty hearing, that asking for the death penalty was not easy, that this was his first capital hearing, and that he believed that the defendant in the instant case merited the death penalty. We stated, "The argument here suggesting that the prosecutor's previous experience was somehow relevant to whether this defendant should be sentenced to death could only have served to inject an improper and irrelevant consideration into the jury's deliberations." (*Yates*, 98 Ill. 2d at 539.) The remarks in that case suggested that the prosecutor was vouching for the decision to seek the death penalty; by informing the jurors that the case was his first capital sentencing hearing, the prosecutor implied that the offense was particularly egregious and especially deserving of the death penalty. We do not believe that the remarks in the present case could have been construed in the same fashion.

The defendant also challenges the prosecution's comment, made in argument, questioning the sincerity of his testimony at the sentencing hearing that he felt sorry for the families of the victims. We note that no objection was made to the statement, and we believe that the jury would have properly construed the remark as a fair comment on the defendant's testimony at the hearing, rather than as an improper expression of personal opinion.

The defendant next contends that certain portions of the State's argument at the sentencing hearing improp-

erly appealed to the jurors' emotions. The defendant complains of several remarks already cited, such as the comments on the enormity of the offenses, which described the defendant as "every woman's nightmare," and the remark that the defendant lived out "the satanic bible," an allusion to the mitigating evidence of the defendant's religious activities while incarcerated. We consider the remarks to be somewhat dramatic statements of the evidence, but we do not believe that they undermined the fairness of the proceeding.

The defendant also challenges the following comments: "What about Lori Borowski's rights? What about her right to have a family and get married and have children? What about Shui Mak's rights to be with her family? Would she like to have a sandwich today? Would she like to sleep on a hard chair?" "What about Mrs. Davis? Did she have a right to come home and see her husband that night? What about Linda Sutton? What about her child?" "We are here because four living human, breathing beings with friends and families died violent deaths." In addition, the defendant complains that the prosecution improperly noted that Shui Mak had been in the United States for only several years at the time of her death and had little command of the English language.

Comments similar to several of those quoted above were considered by this court in *People v. Spreitzer* (1988), 123 Ill. 2d 1, which involved Edward Spreitzer's appeal from his conviction and death sentence for the murder of Linda Sutton. Referring to comments by the prosecutor touching on the victims' rights and what the victims would like to be doing if they were alive, we stated that the remarks were improper, but we did not believe that they had affected the overall fairness of the sentencing hearing. *Spreitzer*, 123 Ill. 2d at 36-37.

In his final set of challenges to the State's argument at the sentencing hearing, the defendant contends that

the prosecution misstated certain principles of law. The defendant argues that during rebuttal argument the prosecutor improperly advised the jurors to follow the law by sentencing the defendant to death, and by remarking that the defendant sentenced himself to death each time he abducted one of the victims. We believe that the jury would have correctly understood the remarks not as literal statements of law but as comments on the evidence, and we do not believe that they denied the defendant a fair sentencing hearing.

E

The defendant next alleges several errors in the jury instructions that were used at the sentencing hearing in his case. The defendant first argues that the trial judge erred in refusing to inform the sentencing jury that the defendant would be sentenced to a term of natural life imprisonment if the death penalty was not imposed in the present case. At the start of the first stage of the sentencing hearing, the jury was instructed, without objection, that the defendant would be sentenced to a term of imprisonment if he did not receive the death penalty. (See Illinois Pattern Jury Instructions, Criminal, No. 7A.09 (2d ed. 1981) (IPI Criminal 2d).) During the second stage of the sentencing hearing, the State made a motion *in limine* to preclude defense counsel from informing the jurors, through either evidence or a jury instruction, that the defendant would be sentenced to a term of natural life imprisonment if the death penalty was not imposed. In the defendant's case, a term of natural life imprisonment was the statutorily required alternative to the death sentence, given his convictions for the murder of Lori Borowski and Rose Beck Davis. (See Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(c).) Defense counsel offered an instruction that would advise the jury of the mandatory term of natural life imprison-

ment. The trial judge granted the State's motion and declined to give the jury the defendant's proposed instruction, in accordance with our decisions on that question. (See *People v. Stewart* (1984), 105 Ill. 2d 22, 70-71; *People v. Albanese* (1984), 102 Ill. 2d 54, 81.) At the conclusion of the second stage of the hearing, the jury therefore received an instruction in the form of IPI Criminal 2d No. 7A.15, which refers simply to an unspecified period of imprisonment as the alternative to a sentence of death. The jury was told, "If, after your deliberations, you are not unanimous in concluding that there is no mitigating factor or factors sufficient to preclude imposition of the death sentence, sign the form of verdict so indicating. If you sign this form, the court will sentence the defendant to imprisonment."

The defendant now contends that the trial court's refusal to give the requested instruction on natural life imprisonment was error, and he relies on our opinion in *People v. Gacho* (1988), 122 Ill. 2d 221. In *Gacho* we held, pursuant to our supervisory authority, that in cases in which a term of natural life imprisonment is the statutorily required alternative to a sentence of death, capital sentencing juries should be instructed to that effect. The court said:

> "An instruction in the case of multiple murders should state that if the jury finds mitigating factors sufficient to preclude imposition of the death penalty, the defendant will be sentenced to natural life imprisonment, and no person serving a term of natural life imprisonment can be paroled or released, except through executive clemency." (*Gacho*, 122 Ill. 2d at 262.)

In *Gacho* we gave the new rule only prospective effect, however, limiting its availability to proceedings conducted after February 11, 1988, the date of the decision. The defendant's sentencing hearing was conducted in

March 1987, and accordingly the new rule was not available in the defendant's case.

The defendant attempts to distinguish *Gacho* on the ground that he is challenging the propriety of the IPI instruction that was used at his sentencing hearing, rather than the effective date of the decision in that case. The defendant's suggested distinction is illusory. At the time of the proceedings in this case, the trial judge correctly declined to use the defendant's proposed instruction. The judge's decision was in accordance with our prior decisions in *Stewart* and *Albanese*. Thus, at the time of the defendant's sentencing hearing, the proper jury instruction was given. *Gacho* modified the law to that extent, but gave the new rule prospective effect only. We have previously determined that the *Gacho* rule is unavailable to defendants whose capital sentencing hearings were conducted before it was announced (see *People v. Coleman* (1989), 129 Ill. 2d 321, 348-49; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 430-31; *People v. Young* (1989), 128 Ill. 2d 1, 57-58; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 43-44), and we decline to announce a different rule in the defendant's case.

The defendant next contends that the trial judge erred in instructing the jury, at both stages of the bifurcated sentencing hearing, not to be swayed by sympathy in its deliberations. The defendant contends that the instruction effectively precluded the jurors from considering the full range of mitigating evidence presented in his behalf during the proceedings.

At the first and second stages of the death penalty hearing the jury received an instruction in the form of IPI Criminal 2d No. 1.01(5), which stated, "Neither sympathy nor prejudice should influence you. You should not be influenced by any person's race, color, religion, or national ancestry." Defense counsel did not object to the use of the instruction, nor did he raise the point in the

post-trial motion. Accordingly, counsel failed to preserve the issue for review. (*People v. Young* (1989), 128 Ill. 2d 1, 58.) It may be noted, however, that we have previously considered and rejected the same challenge to the sympathy instruction (*e.g.*, *People v. Spreitzer* (1988), 123 Ill. 2d 1, 41-43; *People v. Emerson* (1987), 122 Ill. 2d 411, 442-43), and the defendant presents no reason that would warrant our reconsideration of those holdings.

Like the similar instruction approved for use in capital cases by the Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837, our own State's sympathy instruction, IPI Criminal 2d No. 1.01(5), is intended to admonish jurors that their decision in a case should be based on the evidence presented rather than on extraneous influences. In *Brown* the Court considered an instruction that advised jurors that they " 'must not to be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.' " (*Brown*, 479 U.S. at 540, 93 L. Ed. 2d at 939, 107 S. Ct. at 839.) The Court rejected the argument that the instruction might have prevented the jurors from giving full consideration to the defendant's mitigating evidence. We have previously determined that our own State's sympathy instruction would have the same effect (*Spreitzer*, 123 Ill. 2d 1; *Emerson*, 122 Ill. 2d 411), and we adhere to that view.

In his final challenge to the jury instructions that were used at the sentencing hearing, the defendant contends that the trial judge erred in failing to instruct the jurors on the absence of evidence corroborating the defendant's statements to police officers that he had participated in some 16 or 17 different homicides. The defendant bases this argument on *People v. Devin* (1982), 93 Ill. 2d 326, 345-49, in which a new capital sentencing hearing was ordered because the trial judge

failed to give the jurors such a cautionary instruction on his own motion.

In *Devin* the State presented, as part of its case in aggravation at the defendant's capital sentencing hearing, evidence of statements the defendant had made in which he asserted his familiarity with killing and described in detail various forms of torture. There was also evidence that the defendant had a sociopathic personality disorder and that persons with such disorders often devise fantasies, which they might later attempt to carry out. The court said:

> "The jury heard the testimony concerning the conversations with defendant without being given a cautionary instruction that there was no corroborating evidence which tended to prove that any of the conduct described had in fact occurred. The jury was given no guidance that would assist them in the determination of whether the conversations to which the witnesses testified purported to recount actual occurrences or whether they were pure fantasy. Absence of such guidance would permit the jury to reach a conclusion as to defendant's 'character and propensities,' not on the basis of his conduct, but on the basis of his sociopathic fantasies." (*Devin*, 93 Ill. 2d at 349.)

Because of the "extraordinary circumstances" present in the case, the court concluded that the trial judge should have instructed the jury, *sua sponte*, on the absence of evidence corroborating the defendant's violent statements. *Devin*, 93 Ill. 2d at 349.

We do not believe that the concern expressed in *Devin* is applicable here. The evidence in *Devin* was entirely uncorroborated. The defendant in *Devin* made his statements to persons other than law enforcement officers, and the statements were not made during the course of interrogation by law enforcement officers. The circumstances in which the statements were made suggested that the defendant simply may have been bragging. Also, there was expert psychiatric testimony that

persons with disorders such as the defendant's were prone to fantasizing. In this case, however, there was extensive evidence establishing the defendant's guilt of at least four murders, as detailed in his statements concerning those crimes, admitted at trial and at the sentencing hearing. (See *People v. Albanese* (1984), 102 Ill. 2d 54, 72.) Moreover, the defendant made his statements while being questioned by law enforcement officers. When the defendant made those remarks, he thus had no incentive to exaggerate his criminal history, unlike the defendant in *Devin*, who might have been attempting to impress his audience. And unlike *Devin*, there was no evidence in this case that the defendant would tend to create violent fantasies. The extraordinary circumstances found to warrant the use of a special cautionary instruction in *Devin* are absent here, and the trial judge did not err in failing to provide the jury with such an instruction.

## III

The defendant also raises a number of challenges to the constitutionality of the Illinois death penalty statute (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) under the eighth and fourteenth amendments (U.S. Const., amends VIII, XIV). We have previously considered and rejected the same contentions, and the defendant has not presented us with any grounds that would warrant our reconsideration of those decisions.

We have held that the statute is not invalid for the discretion it accords the prosecutor in deciding whether to seek the death penalty in a particular case. (*People v. Lewis* (1981), 88 Ill. 2d 129, 146; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 534-43.) The statute does not exert a disparate impact on minority defendants or on defendants whose victims are white. (*People v. Britz* (1988), 123 Ill. 2d 446, 475-79; *People v. Orange* (1988),

121 Ill. 2d 364, 392; *People v. Davis* (1987), 119 Ill. 2d 61, 64-68.) Nor does duplication of the aggravating circumstances listed in the death penalty statute as criteria for imposition of a term of natural life imprisonment (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)(b)) prevent the capital sentencing scheme from adequately narrowing, to a unique and cognizable group, those persons who may be sentenced to death. (*People v. Jimerson* (1989), 127 Ill. 2d 12, 55; *People v. Whitehead* (1987), 116 Ill. 2d 425, 463-65.) The statutory exemption from the death penalty of those who may stand trial only with the aid of special forms of communicative assistance (Ill. Rev. Stat. 1981, ch. 38, pars. 104—22, 104—26(b)) does not render the capital sentencing scheme unconstitutional. (*Whitehead*, 116 Ill. 2d at 460-62.) The death penalty statute is not unconstitutional for failing to impose on the State the burden of establishing beyond a reasonable doubt the absence of mitigating circumstances sufficient to preclude a sentence of death. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 68; *People v. Garcia* (1983), 97 Ill. 2d 58, 80-82; *People v. Free* (1983), 94 Ill. 2d 378, 421; *People v. Brownell* (1980), 79 Ill. 2d 508, 531-34.) Nor does the statute unconstitutionally impose on the defendant the burden of establishing the existence of mitigation sufficient to preclude the death sentence, preventing an individualized consideration of the offender and the offense. *People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49.

The defendant also argues that various aspects of the capital sentencing scheme, including some of those already discussed, work alone or in combination with other features of the statute to invite its arbitrary and capricious imposition. We have held, however, that comparative proportionality review is not required by the Federal Constitution (*Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871), and the Illinois death

penalty statute is not invalid for failing to provide such review (*King*, 109 Ill. 2d at 551; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *Brownell*, 79 Ill. 2d at 541-44). The statute is not invalid for failing to require the sentencing authority to provide a written memorial of its findings. (*King*, 109 Ill. 2d at 550-51; *Stewart*, 104 Ill. 2d at 497; *Brownell*, 79 Ill. 2d at 541-44.) There is no constitutional requirement that the defense be provided with pretrial notice of the statutory aggravating circumstances on which the State intends to rely at the sentencing hearing. (*King*, 109 Ill. 2d at 547; *People v. Gaines* (1981), 88 Ill. 2d 342, 369.) Nor is the statute invalid because it fails to require the sentencing authority to make a separate determination that death is the appropriate penalty in a case. (*People v. Whitehead*, 116 Ill. 2d at 462-63; *People v. Morgan* (1986), 112 Ill. 2d 111, 147.) In view of our prior decisions upholding those aspects of the death penalty statute, we do not believe that it can be said that their cumulative operation invites its arbitrary and capricious imposition.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Fed-

eral court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.

## IV

For the reasons stated, the defendant's convictions and sentences are affirmed. The clerk of this court is directed to enter an order setting Tuesday, March 27, 1990, as the date on which the sentence of death, entered in the circuit court of Du Page County, is to be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is currently confined.

*Judgment affirmed.*