2025 IL App (1st) 240119

SECOND DIVISION
August 19, 2025

No. 1-24-0119

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| HENRY HARRELL, as Independent Administrator of the Estate of Stacy Vaughn Harrel, Deceased, and KIMBERLYN MYERS, | ) ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | Nos. 17 L 10177 & 18 L 6323 (cons.) |
| THE CITY OF CHICAGO, a Municipal Corporation, TERRANCE ALLEN, SHAUN SUSNIS, MEGAN RYAN, and UNKNOWN POLICE OFFICERS, | ) ) ) ) ) | Honorable Toya T. Harvey, Judge Presiding |
| Defendants-Appellees. | ) | |

_____

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Justices McBride and Howse concurred in the judgment and opinion.

**OPINION**

¶ 1   Plaintiffs, Kimberlyn Myers and her deceased mothers' estate, sued to recover damages resulting from an accident between their car and a Kia Sorrento, the latter of which was fleeing from officers of the Chicago Police Department (CPD), defendants here. The accident claimed the life of Kimberlyn's mother, Stacy. The complaint alleged that the officers engaged in "willful and wanton conduct" in initiating and continuing their pursuit of the Kia that led to the fatal car crash. After trial, the jury awarded over $10 million to plaintiffs.

¶ 2    Defendants moved for a new trial, claiming a litany of intentional and material violations of various motions *in limine*, as well as improper closing argument. The trial court agreed that several violations, collectively, deprived defendants of a fair trial and ordered a new trial.

¶ 3    Plaintiffs timely appealed, claiming the trial court erred, that in fact no material violations of the pretrial motions occurred, and certainly not enough to warrant a new trial. While we may not agree with all the trial court's findings of violations, overall we cannot say that the grant of a new trial was an abuse of discretion. We thus affirm.

¶ 4                                    BACKGROUND

¶ 5    On June 24, 2017, Stacy Harrel was driving her adult daughter, Kimberlyn, eastbound on 59th Street near La Salle Street. Several blocks to the northeast, CPD officers heard gunshots and saw a white Kia Sorrento quickly leaving an alley from where the shots were heard. Officers stopped the Kia, believing it was involved, in one way or the other, in the shooting. Defendants, Officers Shawn Susnis and Megan Ryan, responded to the stop already in progress. Officers Susnis and Ryan approached the Kia with guns drawn; another officer removed the rear passenger from the vehicle. The driver floored it, speeding away from the stop. Officers Susnis and Ryan returned to their unmarked car and gave chase. At upwards of 60 miles per hour, the Kia ran a stop sign and collided with plaintiffs' vehicle. The driver and front-seat passenger escaped the scene, but a gun was found inside the Kia.

¶ 6    Stacy died. Kimberlyn suffered a fractured clavicle and lacerated liver in the collision.

¶ 7    Plaintiffs sued, alleging defendants engaged in "willful and wanton conduct" in their stop and subsequent pursuit of the Kia. Plaintiffs argued that the officers had no basis to stop the Kia in the first place and did not conduct the stop correctly. They further argued that the officers

violated CPD policy in their pursuit of the Kia after it fled the stop, most notably by failing to activate their siren as they gave chase.

¶ 8      Before trial, the parties presented pretrial motions.

¶ 9      Among them, defendants sought "[t]o bar testimony, evidence, argument or questioning suggesting that the Police Department's investigation of plaintiffs' accident was inadequate or negligent." The trial court granted that motion but carved out an exception under which plaintiffs could elicit evidence that the driver of the Kia Sorrento was never detained or even located. (The court carved out another exception relating to a spoliation claim, but that is not before us and thus not worth a mention.)

¶ 10     Defendants sought to bar plaintiffs' police-practices expert, Charles Drago, from "testifying that the officers lacked probable cause or reasonable suspicion to stop the Kia after it peeled out of an alley from which shots had been fired." The court ruled that Drago "can certainly talk about the steps of what happened that led up to the stop," but "[w]hat the Court is going to bar is the witness from making a determination that there was probable cause for the stop. Probable cause I believe is a finding for the Court, not for a witness to make."

¶ 11     On this last ruling, plaintiffs' counsel expressed confusion, arguing that "he has to be able to testify that he believed that there was no probable cause to conduct the stop at all, which would not have led to the chase." The court responded that "[h]e can certainly testify that he thought the stop was improper." Counsel understood this to mean that "[s]o long as he doesn't use the probable cause words. Okay."

¶ 12     The case then proceeded to trial. The jury heard the testimony of plaintiffs, the five officers involved in the incident, and plaintiffs' expert. Defendants called no witnesses.

¶ 13    There is no challenge here to the sufficiency of the evidence, so we may summarize. The testimony of the officers was largely redundant of one another. Officers stopped the Kia after hearing shots fired, relying in part on witnesses who pointed in the direction of the alley from which the Kia emerged. Defendant Officers Susnis and Ryan arrived to the stop, already in progress, and approached the vehicle with their guns drawn. Another officer removed a back-seat passenger named Richard Johnson, at which time the Kia sped off. Officers Susnis and Ryan gave chase, which lasted about six blocks before the Kia collided at a high speed with the car operated by Stacy, with Kimberlyn as a passenger. A firearm was found inside the Kia, but the two remaining occupants—the driver and front-seat passenger—fled the scene and were never located.

¶ 14    The gravamen of plaintiffs' claims was that the officers' conduct was willful and wanton and in breach of CPD policies and directives in (i) stopping the Kia Sorrento without having any basis to suspect its involvement in the shooting, (ii) failing to properly secure the vehicle once stopped, and (iii) allowing a high-speed chase to ensue and participating in that chase without activating the siren.

¶ 15    Plaintiffs' expert, Drago, testified that the CPD had no basis for a stop of the Kia Sorrento. He further opined that Officers Susnis and Ryan violated police practices and department policies in their approach to the curbed vehicle. He also criticized their initial pursuit of the Kia, in part because of his earlier opinion that they lacked a basis for the vehicle stop in the first place beyond a mere traffic stop. He likewise opined that the officers should have suspended their chase when it became clear that the driver of the Kia Sorrento was driving dangerously. And finally, Drago testified that the officers breached their standards by failing to activate their siren during the chase, thereby failing to warn the public of the chase.

¶ 16    The jury returned a $10.2 million verdict for plaintiffs. Defendants, among other things, moved for a new trial, claiming that plaintiffs' repeated violations of the motions *in limine*, and their improper closing argument, sufficiently prejudiced them to warrant a new trial. The trial court agreed that plaintiffs "continuously and blatantly disregarded" its pretrial rulings and thus ordered a new trial. We granted plaintiffs leave to appeal under Illinois Supreme Court Rule 306 (eff. Oct. 1, 2020).

¶ 17                              ANALYSIS

¶ 18    Plaintiffs first claim that defendants forfeited their request for a new trial in two distinct ways. They next argue that the court erred in granting a new trial. Defendants defend the court's ruling but also raise a question of our jurisdiction. So we begin there, as we must.

¶ 19                            I. Jurisdiction

¶ 20    Supreme Court Rule 306 allows a party to seek leave to appeal certain interlocutory orders, one of which is "an order of the circuit court granting a new trial." Ill. S. Ct. R. 306(a)(1) (eff. Oct. 1, 2020). For most Rule 306 petitions—including an order granting a new trial—a party must seek leave "within 30 days after the entry of the order." *Id.* § 306(c)(1). Here, it is undisputed that plaintiffs filed their petition for leave to appeal exactly 29 days after entry of the order they challenged.

¶ 21    But a few days later, defendants moved to strike plaintiffs' petition for leave to appeal, claiming the petition exceeded the page/word-count limit for appellate briefs, which is incorporated into Rule 306(c)(1). *Id.*; see Ill. S. Ct. R. 341(b)(2) (eff. Oct. 1, 2020). We granted the motion and struck the "[n]on-compliant brief" but granted plaintiffs "leave, 21 days from the filing of this order, to file an amended brief." Plaintiffs complied with our order.

¶ 22    So of course, when all was said and done, the technically proper version of the petition for leave to appeal was filed long after the 30-day deadline. And this, say defendants, means we lack jurisdiction over the appeal. That is clearly wrong.

¶ 23    The only jurisdictional requirement for appellate review is the notice of appeal, which in the Rule 306 context is a petition for leave to appeal. *Kemner v. Monsanto Co.*, 112 Ill. 2d 223, 236 (1986) (time limit for filing petition under Rule 306 is jurisdictional); *In re Marriage of Likar*, 2024 IL App (3d) 240103, ¶ 12 (same). Plaintiffs satisfied that jurisdictional step. True, the petition was faulty for other reasons. But that had nothing to do with jurisdiction.

¶ 24    We struck the initial petition for leave to appeal for noncompliance with the supreme court rules governing page length or word count. See *Mitchell v. Department of Corrections*, 367 Ill. App. 3d 807, 817 (2006). It would have been within our authority to dismiss the appeal as well, but we consider that "a harsh sanction." *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14. The key word there is "sanction," a discretionary punishment, quite different from a *jurisdictional* flaw we are not permitted to forgive. *Marriage of Likar*, 2024 IL App (3d) 240103, ¶ 10. And we use that discretionary sanction sparingly; we typically only dismiss an appeal due to a noncompliant brief if it is so deficient as to preclude our review. *North Community Bank*, 2015 IL App (1st) 133672, ¶ 14.

¶ 25    We obviously chose not to dismiss this appeal when we granted plaintiffs leave to amend their petition. Even had we done so, it would not have been based on jurisdiction. Our jurisdiction is proper.

¶ 26                            II. Procedural Default

¶ 27    In three different ways, plaintiffs claim that defendants were defaulted from raising some or all of their post-trial challenges to the claimed violations of the pretrial motions. First, they

say, defendants forfeited their right to seek a new trial because they never sought a mistrial, which plaintiffs characterize as a condition precedent to seeking a new trial. Second, defendants forfeited the arguments by not seeking a curative instruction from the trial court to mitigate the violations. And third, at various times throughout their brief, plaintiffs note that, while defendants objected to *some* of the alleged violations of the pretrial orders, at other times they did *not* object, and thus defendants forfeited any claim that the testimony was objectionable.

¶ 28    There are interrelated problems with these forfeiture arguments. For one, they are largely directed at the *trial court's* ability to consider defendants' post-trial arguments. But the trial court does not wear the straitjacket plaintiffs would suggest. The trial court, in its discretion and in the interests of justice, may order a new trial on its own motion, without any request from either party. *Cardona v. Del Granado*, 377 Ill. App. 3d 379, 382 (2007); *Winters v. Kline*, 344 Ill. App. 3d 919, 928 (2003). And if that is true, it is equally true that the trial court, in its discretion, may consider a post-trial motion containing arguments that were technically forfeited by the movant.

¶ 29    This principle has been established at least since 1965, when our supreme court affirmed the trial court's authority in this regard, recognizing "that the role of a trial judge is not that of a presiding officer or an umpire, and that he is responsible for the justice of the judgment that he enters." *Freeman v. Chicago Transit Authority*, 33 Ill. 2d 103, 106 (1965). To hold otherwise "would take away that responsibility and tend to reduce his role to that of an automaton." *Id.*

¶ 30    The circuit court, in other words, is not bound by principles of forfeiture in issuing post-trial relief and may even issue relief on its own motion if justice so requires. See *Holt v. City of Chicago*, 2022 IL App (1st) 220400, ¶ 9 ("there is simply no precedent that we are aware of indicating that a court can 'waive' its powers" to issue post-trial relief). Of course, the circuit court may also *enforce* those procedural-default rules against the offending party and find an

issue forfeited post-trial. *Id.*

¶ 31    So even if it were true that defendants' failure to seek a mistrial, failure to request a curative instruction, or periodic failures to object to testimony constituted a forfeiture of a post-trial argument in whole or in part, the circuit court was not bound by that forfeiture and was free to consider the argument either by post-trial motion or *sua sponte*.

¶ 32    The interrelated problem deals with *appellate* forfeiture, on which plaintiffs base their argument that defendants' periodic failure to object to certain testimony constituted forfeiture, citing such cases as *Dixon v. Industrial Comm'n*, 60 Ill. 2d 126, 132 (1975) ("Objections must be sufficiently specific to make the ground for objection known to the trial court. A general objection will not preserve the question for review on appeal.").

¶ 33    Plaintiffs fail to appreciate that they are the appellants, not the appellees, before us. Appellate forfeiture rules are largely (not entirely) directed at appellants, who have the burden of establishing that the trial court committed error. An appellant generally may not argue any trial error on appeal unless it was raised both at trial and in a post-trial motion. *Snowstar Corp. v. A&A Air Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 83; *LaSalle Bank, N.A. v. C/HCA Development Corp.*, 384 Ill. App. 3d 806, 826 (2008).

¶ 34    But appellees (here, defendants) do not wear that albatross on appeal. A reviewing court "may affirm a trial court's judgment on any grounds which the record supports even if those grounds were not argued by the parties." *In re Detention of Stanbridge*, 2012 IL 112337, ¶ 74. So an argument that defendants may have technically forfeited is fair game to argue on appeal, and we may not only consider it but affirm on that basis.

¶ 35    With all that said, we will note, for the record, that we do not agree with either of plaintiffs' substantive arguments on forfeiture even if they applied to an appellee. While the

failure to seek a curative instruction is one factor to consider in determining whether a new trial is warranted, an appellant's failure to request such an instruction does not forfeit its right to raise the issue post-trial, as long as a contemporaneous objection was raised at trial. *Scott v. Caldwell*, 2024 IL App (1st) 232000-U, ¶ 24 (citing *Jackson v. Reid*, 402 Ill. App. 3d 215, 231 (2010)).

¶ 36    Nor is an appellant required to seek a mistrial to preserve an argument in a motion for new trial. *Id.*; *Brown v. Bozorgi*, 234 Ill. App. 3d 972, 976 (1992) ("a simple objection is sufficient to preserve the issue of misconduct for consideration on a post-trial motion."); *Florek v. Kennedy*, 249 Ill. App. 3d 221, 236 (1993); *Mazurek v. Crossley Construction Co.*, 220 Ill. App. 3d 416, 424-25 (1991) ("the failure to respond to an impropriety with a motion for a mistrial does not waive the right to a new trial on that issue").

¶ 37    To the extent this court's decision in *Holloway v. Sprinkmann Sons Corp. of Illinois*, 2014 IL App (4th) 131118, ¶ 127, held that a motion for mistrial is required to preserve a claim of trial error for post-trial review, we respectfully disagree. But two points are critical here. First, in that decision, the trial court offered the plaintiff's counsel a mistrial after an offending defense comment in the opening statement, and plaintiff's counsel declined that offer on the record. *Id.* ¶¶ 16-24. That was an affirmative waiver, not a mere forfeiture. And second, the plaintiff there was the appellant on appeal, so if nothing else, *Holloway* still would not assist plaintiffs here in charging defendants—the appellees here—with forfeiture, as we explained above.

¶ 38                              III. Motion for New Trial

¶ 39    We turn to the merits of defendants' motion for a new trial. The trial court found numerous violations of motions *in limine* and one error in closing argument that cumulatively denied defendants a fair trial. Plaintiffs say that ruling was error. We will not reverse a circuit

court's ruling on a new trial "except in those instances where it is affirmatively shown that it clearly abused its discretion." *Maple v. Gustafson*, 151 Ill. 2d 445, 455 (1992).

¶ 40    We note at the outset that plaintiffs do not claim that any of the pretrial rulings were erroneous, so we do not take up those questions. They only disagree that they violated the pretrial orders or, at least, that any violations warranted a new trial. So we keep our focus there.

¶ 41                                  A. Motions *in Limine*

¶ 42    A simple violation of a motion *in limine* does not automatically entitle a party to a new trial. *Bakes v. St. Alexius Medical Center*, 2011 IL App (1st) 101646, ¶ 40. A new trial is warranted "only where the order is specific, the violation is clear, and the violation deprived [a party] of a fair trial." *Id.*

¶ 43                          1. Evidence of Post-Crash Investigation

¶ 44    The court barred plaintiffs from introducing any testimony or evidence "suggesting that the [CPD]'s investigation of plaintiffs' accident was inadequate or negligent." The accident, of course, came at the tragic end of the officers' vehicular pursuit of the Kia. Defendants objected in several different instances to a violation of this pretrial order.

¶ 45                                a. Investigation in Alley

¶ 46    First, for context, recall that the officers first became aware of the Kia after hearing gunshots and seeing it speed out of a nearby alley in the direction from which those shots were heard. During the adverse examination of Officer Murillo, plaintiffs' counsel asked about his state of mind at the time he curbed the Kia:

> "Q. And nobody ever went into that alley to look to see what happened?
>
> [DEFENSE COUNSEL]: Objection, motion *in limine*.
>
> THE COURT: Sustained.

Q. Did anybody go into the alley to see what happened?

[DEFENSE COUNSEL]: Same objection.

THE COURT: Sustained."

¶ 47    At a sidebar, counsel disputed that this question violated the pretrial order on post-crash investigation: "[t]his is what is happening in real time as they're pulling over the vehicle. They're following it. In the meantime, nobody is going in to check to see what's happening in that alley." Counsel argued that the "[d]efense is being allowed to bring up the gun" to bolster the officers' belief that occupants of the Kia were armed, and plaintiffs "should have an opportunity to rebut." The court sustained the objection.

¶ 48    We find no clear violation of the pretrial order here. The pretrial order only addressed the *post-crash* investigation. Counsel made clear that he was interested in the real-time events, trying to demonstrate that the officers did not adequately investigate their suspicions about the Kia's occupants at the time they stopped the vehicle.

¶ 49    Still, the court couched its sustaining of the objection on relevance. And though it is not clear to us why this testimony would *not* have been at least somewhat relevant to the officers' state of mind at the time of the stop, the court nevertheless ruled. And yet plaintiffs' counsel proceeded, two questions later, to ask Officer Murillo: "You chose not to go into the alley to investigate whether somebody had been shot?" Defendants objected, of course, and the trial court sustained the objection again.

¶ 50    So while we find no violation of the pretrial ruling at this juncture, it remains that the court ordered that line of questioning out of bounds on relevance grounds, and plaintiffs' counsel persisted with a third question after that ruling.

¶ 51    And plaintiffs' counsel kept with this line of questioning later, when examining Officer

Powell about his reaction after hearing the gunshots and seeing the Kia speed away:

"Q. And then did you witness anybody actually firing any weapons?

A. No.

Q. Did you see anybody being shot?

A. No.

Q. Did you find anybody who was shot?

A. No.

Q. Did you find anybody who was the target of the shooting?

[DEFENSE COUNSEL]: Objection. Motion *in limine*.

THE COURT: Sustained.

Q. Did you see anybody who was the target of the shooting?

A. No."

¶ 52    Plaintiffs again persisted in this line of questioning even after the trial court had ruled that

topic off-limits, right or wrong, based on relevance. Regardless of whether plaintiffs agreed with

that ruling (and regardless of whether we do), counsel was dutybound to respect the trial court's

ruling. But we agree with plaintiffs, overall, that this line of questioning did not appear to violate

the pretrial order regarding post-accident investigation.

¶ 53                        b. Evidence of Gun Recovered from Kia Sorrento

¶ 54    On redirect examination of Officer Ryan, plaintiffs' counsel questioned the officer about

the gun found in the Kia. Among the questions was, "Do you know if the gun was ever

associated with any of the passengers?" Defendants objected based on "motion *limine*." The

court sustained the objection. This was a clear violation of the pretrial order barring evidence of the post-accident investigation.

¶ 55    That line of questioning continued with plaintiffs' counsel's questioning of their police-practices expert, Drago:

"Q. Is there any evidence that you looked at that the gun belonged to anybody in that Kia?

[DEFENSE COUNSEL]: Objection, motion—

THE COURT: Sustained.

Q. Did you ever find out whether or not there were fingerprints found on the gun?

[DEFENSE COUNSEL]: Objection, motion *in limine*.

THE COURT: Sustained, Counsel.

Q. Did you ever find out as to whether or not the gun had ever been used in a crime that night?

[DEFENSE COUNSEL]: Objection—

THE COURT: Sustained. Counsel, stay away from this line of questioning.

Q. Did you ever find out if the gun was a gun that was discharged?

[DEFENSE COUNSEL]: Objection, motion *in limine*.

THE COURT: Sidebar. [Outside the presence of the jury:] So, Counsel, I will put on the record the Court has made quite clear its ruling as it relates to this line of questioning. And if you continue on this line of questioning, Counsel, I am warning you now that I will consider contempt."

¶ 56    Plaintiffs' counsel argued to the court that he was only interested "if any of the officers were aware of *** this information at the time of the chase. Not did they find out later."

¶ 57    The court was not moved by that argument and rightly so. Not one of the questions from the above quote related to anything an officer could possibly know at the time of the vehicular stop—whether the gun belonged to any particular occupant, whether fingerprints were found on the weapon, whether the gun had been used in a crime, or whether it had been discharged. These questions were flagrant violations of the pretrial order barring evidence of post-accident investigation. Nor were they remotely relevant to any issue in this case, namely whether the officers acted with willful and wanton misconduct in stopping the vehicle and later conducting an improper pursuit of the vehicle. What the officers *later* discovered or did not discover had no relevance to the outcome of this case.

¶ 58                        2. Expert Testimony on Reasonable Suspicion

¶ 59    Defendants moved *in limine* to bar plaintiffs' expert, Drago, from testifying "that the officers lacked probable cause or reasonable suspicion to stop the Kia after it peeled out of an alley from which shots had been fired and then circled back toward the same location and were acting merely on a hunch." Defendants argued that questions of probable cause and reasonable suspicion were legal questions not amenable to expert testimony. The court granted the motion.

¶ 60    Again, we are not asked to rule on the propriety of the pretrial order, only whether and to what effect plaintiffs violated it.

¶ 61    Typically, a traffic stop is a *Terry* stop, a seizure under the fourth amendment requiring reasonable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 22 (1968); *People v. Timmsen*, 2016 IL 118181, ¶ 9. Reasonable suspicion is a less demanding standard than probable cause but must be based on specific, articulable facts, not merely a hunch or gut feeling. *Terry*, 392 U.S. at 27; *Timmsen*, 2016 IL 118181, ¶ 9.

¶ 62    The court told plaintiffs' counsel that Drago could testify "about the conduct of the

officers in making the stop, then through the accident in question," but the court would not allow Drago to opine "that there was probable cause for the stop," which the court believed "is a finding for the court to make." The court later added: "[Drago] can certainly testify that he thought the stop was improper." Plaintiffs' counsel then replied, "So long as he doesn't use the probable cause words. Okay." (This last exchange will be relevant later.)

¶ 63    There can be no dispute that Drago did, in fact, testify as to the officers' lack of reasonable suspicion throughout his testimony:

"Q. During your review of any of the evidence, were you able to make any determination that there was any reasonable basis to believe that the Kia was involved with any shooting?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

Q. What if any opinions did you formulate as a result of this initial review? And we're just talking about up to the felony stop.

A. So when they stopped this vehicle, they didn't have—in my opinion, did not have reasonable suspicion in order to stop that vehicle. And an officer has to—

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained.

[PLAINTIFFS' COUNSEL]: Your Honor—okay.

Q. What is your opinion regarding whether or not the officers had reasonable suspicion to pull over this vehicle?

[DEFENSE COUNSEL]: Objection, motions *in limine*.

THE COURT: Sustained."

- 15 -

¶ 64    A sidebar followed. Plaintiffs' counsel argued that the pretrial ruling was incorrect and that, in any event, defendants "opened the door" to this testimony when officers testified about the officers' reasonable suspicion to believe the Kia Sorrento contained armed and dangerous occupants. We will get into that door-opening argument later; suffice it to say, for now, that the court reaffirmed its pretrial ruling. The questioning then continued:

> "Q. Mr. Drago, based on your review of the actions of the officers in this case and the information that they had available to them, do you believe that the officers in this case—do you believe there's any support for probable cause to pull the Kia over?
>
> [DEFENSE COUNSEL]: Objection, *motions in limine*.
>
> THE COURT: Sustained.
>
> Q. Mr. Drago, based on your review of the actions of the officers in this case, what opinions did you form?
>
> A. First of all, they did not have reasonable suspicion to pull this car over.
>
> [DEFENSE COUNSEL]: Objection, move to strike.
>
> THE COURT: Sustained."

¶ 65    We can find no fault with the trial court's inclusion of this line of questioning among the examples where plaintiffs' counsel "continuously and blatantly disregarded *** the Court's rulings," noting that after the court advised counsel not to pursue this line of questioning, counsel "continued their questioning, placing the issue of probable cause before the jury when the Court had already clearly ruled it was not an issue before the jury."

¶ 66    And this was not an instance where the objections always prevented the answers from Drago. In several instances quoted above, counsel asked open-ended questions that allowed Drago to testify to his legal conclusion, with counsel objecting *after* the jury heard the answer.

¶ 67    Plaintiffs raise two arguments in response. First, they say, the court only barred testimony related to probable cause, not reasonable suspicion. To be clear on this, as we previewed above, defendants sought to bar expert testimony as to *both* legal justifications for a stop, arguing that an expert could not testify to legal conclusions, and the court indicated its agreement with defendants' argument on that very basis. It is true that, in orally restating what was permissible and impermissible, the court stated that Drago could not testify as to *probable cause* but made no mention of reasonable suspicion, to which plaintiffs' counsel said, "So long as he doesn't use the probable cause words. Okay."

¶ 68    The trial court was not moved by plaintiffs' attempt to split the two legal justifications apart based on her shorthand oral summary of her ruling. In the trial court's view, counsel should have clearly understood that what applied for the doctrine of probable cause applied equally to the concept of reasonable suspicion—they were both improper subjects of expert testimony for the very same reason. The court found plaintiffs' counsel "disingenuous" for suggesting there was confusion on this topic, saying she "[did] not believe" counsel.

¶ 69    As a reviewing court far removed from the action, we are in no position to second-guess the judge's conclusion in this regard. And to that we would add that, even if counsel was initially confused, counsel persisted in eliciting testimony from Drago on reasonable suspicion even after being clearly admonished by the trial court to stop.

¶ 70    Plaintiffs' counsel also argues that defendants "opened the door" to Drago's testimony about reasonable suspicions when the officers, themselves, testified that they had reasonable suspicion to believe the occupants of the Sorrento were involved in the shooting. Defendants counter that the officers were *plaintiffs'* witnesses, not theirs, to which plaintiffs reply that Officers Susnis and Ryan were adverse witnesses whose testimony about reasonable suspicion

was gratuitous, not responsive to the questions they were asked. Defendants further argue that there is a fundamental difference between barring *expert* testimony versus lay testimony.

¶ 71    Officer Susnis's testimony on this point, on plaintiffs' direct examination as an adverse witness, was as follows:

> "Q. Now, when you came up, when you pulled up to the Kia, before you got out of your car, the only offense, the only thing that the Kia was—the only law that the Kia had violated was a traffic law, that is, he peeled out of the alley, correct?
>
> A. No.
>
> Q. Okay. What other law did you know that the Kia had violated when you pulled up?
>
> A. So I was acting under reasonable suspicion that the vehicle had shot at someone or something and that this vehicle was involved in shots fired."

¶ 72    We tend to agree with defendants that this testimony was more or less invited by the question. The point the officer was making—a responsive one, in our view—was that while he might not have *known* for certain what laws the occupants of the Kia had broken, he *suspected* that they were involved in the shooting. The court would be within its discretion to consider that fleeting mention as something less than opening the door to a full-throated discussion of reasonable suspicion.

¶ 73    Yet plaintiffs' counsel baited Officer Susnis into yet another discussion of the topic:

> "Q. If, in fact, the Kia was being chased by you based on a hunch that he was involved—that they were involved in the shooting, would this [pursuit] policy apply?
>
> A. We don't use hunches. We use reasonable suspicion. And it's the totality of the circumstances."

¶ 74    The officer had little choice but to take issue with the concept of acting on a hunch, something that black-letter law has told us for decades is insufficient for reasonable suspicion. See *Terry*, 392 U.S. at 27.

¶ 75    That brings us to Officer Ryan's testimony, also as an adverse witness questioned on direct examination by plaintiffs' counsel:

"Q. Now it's your—you're telling this jury today that the reason you went after the Kia is you just wanted to keep eyes on it, right?

A. To follow what we suspected, what we had reasonable articulable suspicion, which is not probable cause, but it's more than a hunch, and our officers and what we believed this car was suspected of just shooting a gun in the area."

¶ 76    Plaintiffs characterize the above testimony as "blurting out" the reasonable-suspicion standard. To some extent that may be true, but it is likewise true that the answer was generally responsive. Plaintiffs' counsel was trying to pin down one and only one reason why Officer Ryan was following the Kia, and her answer was responsive in that it more fully expanded on *why* they followed it.

¶ 77    We would further note that plaintiffs' counsel said nothing to the court about any doors opening or about any alleged unfairness in allowing the lay witnesses to testify to something forbidden to his expert. Instead, plaintiffs' counsel doubled down:

"Q. Well, tell the ladies and gentlemen of the jury what the basis was for your articulable suspicion, other than the fact that the Kia was in the area of shots being fired. Tell me anything else that you knew before the chase that supports that articulable suspicion.

A. The foundation for my reasonable articulable suspicion that night was the—

what we now know of Murillo and Powell's 35-plus year experience, hundreds of

responses to loud reports or shots fired calls, that they know what gunshots sound like,

that they heard several gunshots in the area along with—I did not know that at the time,

but that we now know that the civilians pointed westbound. That's not—my reasonable

suspicion at the time was their saying that there were loud reports in the area, and then

the path that this vehicle took, a complete square back to where the shots were heard."

¶ 78    Whatever may have been true of Officer Ryan's first statement above, it was plaintiffs' counsel and only plaintiffs' counsel who belabored the point, continuing to ask questions. We would further note, again, that plaintiffs' counsel never called this potential "open door" to the attention of the trial court before proceeding with the questions about reasonable suspicion put to their expert, Drago. If plaintiffs' counsel truly believed that earlier testimony—coming from their own witnesses, if adverse ones—actually required a reconsideration of a pretrial order, plaintiffs' counsel should have brought this matter to the court's attention before springing it on direct examination of their expert. There may be times when asking for forgiveness, not permission, is the better approach, but not when arguably violating a judge's pretrial order.

¶ 79    In any event, as defendants note, the court never barred the officers from explaining their state of mind—their reasonable suspicion for the vehicular stop. Nor did plaintiffs seek such a pretrial order. The court's pretrial order was directed at the expert. It would not be the first time a court has feared that testimony from an expert ran the risk of carrying more weight with the jury than a layperson's. See *Todd W. Musburger, Ltd. v. Meier*, 394 Ill. App. 3d 781, 800 (2009); *People v. Munoz*, 348 Ill. App. 3d 423, 441 (2004); *Sohaey v. Van Cura*, 240 Ill. App. 3d 266, 283 (1992)).

¶ 80    Plaintiffs also fault defendants for not objecting to the officers' testimony regarding reasonable suspicion at every single instance. We have already explained above that, to the extent this failure to object is viewed as forfeiture, it is not well taken with regard to an appellee. And beyond that, we fail to see how it was defendants' obligation to object to testimony that was not the subject of their motion *in limine*.

¶ 81                          B. Burden Shifting in Closing Argument

¶ 82    We move away for the moment from the alleged violations of pretrial motions and consider the trial court's determination, which defendants advance on appeal, that plaintiffs' counsel engaged in improper burden-shifting in closing argument.

¶ 83    During closing argument, plaintiffs' counsel commented on the fact that defendants had not produced witnesses or, in particular, an expert to counter their expert, Drago:

"[PLAINTIFFS' COUNSEL]: You'll notice in this case that the City called no witnesses—

[DEFENSE COUNSEL]: Objection, burden shifting.

THE COURT: Sustained.

[PLAINTIFFS' COUNSEL]: You'll notice in this case that no witness testified that the policy didn't apply. No expert came in.

[DEFENSE COUNSEL]: Objection, burden shifting.

[PLAINTIFFS' COUNSEL]: That's proper.

THE COURT: Sustained.

[PLAINTIFFS' COUNSEL]: No witness came in and said that the policy was properly executed or didn't apply in this case. You know why? Because the City couldn't find one.

[DEFENSE COUNSEL]: Objection, burden shifting.

[COURT]: Sustained.

[PLAINTIFFS' COUNSEL]: If there was someone on the City side who was going to come in—

[DEFENSE COUNSEL]: Objection, burden shifting. Can we have a sidebar?

[PLAINTIFFS' COUNSEL]: I'll withdraw the question."

¶ 84    Counsel is afforded "wide latitude" during closing argument and may " 'comment and argue on the evidence and any inference that may be fairly drawn' " from it. *McCarthy v. Union Pacific R.R. Co.*, 2022 IL App (5th) 200377, ¶ 63 (quoting *Clarke v. Medley Moving & Storage, Inc.*, 381 Ill. App. 3d 82, 95 (2008)). But a party may not shift the burden of proof to its opponent. See *Niewold v. Fry*, 306 Ill. App. 3d 735, 744-745 (1999).

¶ 85    In civil cases, parties are allowed some leeway in this regard. A plaintiff may, for example, point out that "that their expert's testimony was unrebutted." *Id.* at 745. Likewise, a party may note that its expert provided "the only testimony on the progress of plaintiff's disc condition." *Lebrecht v. Tuli*, 130 Ill. App. 3d 457, 484 (1985). But it typically crosses the line to go further and say, as the plaintiff's counsel did in *Niewold*, that " 'the defense, who knew for two years that this [expert] was going to testify they never—they never secured an expert.' " 306 Ill. App. 3d at 744. Counsel's statements here were not materially different than those in *Niewold*, where we found the testimony to constitute improper burden shifting. *Id.*

¶ 86    Plaintiffs rely on *Wilson v. Moon*, 2019 IL App (1st) 173065, ¶ 50, to argue that they did not engage in burden shifting. There, the defendant commented that the plaintiff failed to call an expert because " 'they couldn't find one.' " *Id.* We found that comment to be "proper argument based on the evidence presented during the trial." *Id.* But as defendants note, the comment in

*Wilson* was made by *defense* counsel about *plaintiff's* failure to call an expert, which could not amount to burden shifting, as the plaintiff always has the burden of proof in a civil action. See *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 98 (2005). Here, in contrast, plaintiffs' counsel criticized the defense's failure to present expert testimony.

¶ 87    We recognize that the law permits remarks about a party's failure to call a witness within that party's control. See, *e.g.*, *Bargman v. Economics Laboratory, Inc.*, 181 Ill. App. 3d 1023, 1028 (1989); *Ryan v. E.A.I. Construction Corp.*, 158 Ill. App. 3d 449, 462-63 (1987) (defendants failed to call employee who had been listed as their expert and twice deposed); Illinois Pattern Jury Instructions, Civil, No. 5.01 (approved Dec. 8, 2011) ("Failure to Produce Evidence or Witness"). But that issue is not present here. There is no claim that any previously retained expert witness was not called. So we can safely put that aside.

¶ 88    The trial court did not abuse its discretion in determining that plaintiffs' counsel statements in closing argument amounted to burden shifting. Counsel's arguments in closing, at times, clearly crossed the line from arguing that their evidence was unrebutted to shifting the burden onto defendants. We would add, as well, that counsel persisted in making these statements long after the trial court had repeatedly sustained objections to it, and the statements grew more inflammatory in open defiance of the trial court's rulings.

¶ 89                                    C. Cumulative Error

¶ 90    Taking everything we have detailed above into account, the trial court did not clearly abuse its discretion in determining that the combination of improper testimony and closing argument denied defendants a fair trial. We have outlined above an entire line of questioning regarding the post-accident investigation that the court clearly ruled out of bounds and in which plaintiffs' counsel persisted despite very clear rulings, not only pretrial but during trial, warning

them away from the topic. On the issue of reasonable suspicion, plaintiffs' counsel repeatedly introduced expert testimony, in several instances of which the jury heard not only the questions but the expert's opinion on reasonable suspicion. Again, this testimony clearly violated the court's pretrial order, and counsel persisted in the face of repeated admonishments from the court. And we cannot say the court abused its discretion in finding that counsel engaged in burden-shifting in its closing arguments—yet again in open defiance of the trial court's rulings.

¶ 91    The upshot was that the jury heard much commentary on topics the court had ruled off-limits. They heard questions and some answers showing that the police could never tie the gun found in the Kia to any criminal offense, an utterly irrelevant, 20/20-hindsight point that served only to cast disfavor on the police and their investigation. They heard an expert say repeatedly that the officers lacked reasonable suspicion to stop the Sorrento in the first place. And they heard counsel tell them that the defense, which had no burden of proof, could not find an expert willing to rebut Drago's testimony.

¶ 92    The court did not abuse its discretion in finding these violations, nor did it abuse its discretion in finding sufficient prejudice to warrant a new trial.[1]

---

[1] Defendants and the trial court identified one other line of questioning that arguably violated pretrial orders that (i) barred any evidence that the CPD officers' training was deficient and (ii) prohibited plaintiffs from saying that the officers violated any standards from jurisdictions other than CPD. We did not consider these "violations" particularly impactful and thus excluded them from our analysis. The expert's references to training were *de minimis* in the larger scheme of his testimony about the vehicular stop. At times, the expert veered somewhat toward suggesting that the officers' conduct of the stop violated phantom, unspecified standards. The upshot of the trial court's ruling was that Drago could criticize the officers' conduct, saying what they "should" and "should not" have done and explain why—without measuring that conduct against any particular standard. We trust that plaintiffs will adhere more carefully to this ruling on remand.

¶ 93                          IV. Issues on Remand

¶ 94    We briefly discuss one remaining issue, as it is likely to recur on remand. Defendants claim, and the trial court agreed with a brief mention in its order for a new trial, that plaintiffs improperly tried to attack the credibility of the officers' testimony via their expert, Drago.

¶ 95    As noted, one of plaintiffs' criticisms of the officers at trial was that the officers had no basis—no reasonable suspicion—to stop the Kia Sorrento in the first place. The officers testified that they believed they were conducting a "felony" stop—that is, a stop of a vehicle whose occupants are armed and dangerous (as opposed to a garden-variety stop for a traffic infraction).

¶ 96    To counter that, plaintiffs used their expert, Drago, to opine that the officers' conduct looked nothing like how a felony stop should look, thereby calling into doubt that the officers truly believed the occupants of the Kia were dangerous. Plaintiffs' counsel frequently asked Drago if the conduct of the officers was consistent with how he would expect officers to handle a traffic stop if they actually believed that the occupants of the car were armed and dangerous.

¶ 97    For example, Drago testified that "police officers who believe that the occupants are armed and dangerous do not just walk up to the car and open the door and start taking people out." He added that "those officers are not acting consistently with an officer who actually does believe those people in that car are armed and/or dangerous."

¶ 98    The defense objected at that point without specifying a reason. Plaintiffs' counsel said, "State of mind of—he's testifying as to the state of mind of the officers and the credibility of their testimony." The court overruled the objection.

¶ 99    In our view, that objection was properly overruled. It is "is generally improper to ask a witness on cross-examination whether an adverse witness' testimony is truthful," as "[q]uestions of credibility are to be resolved by the trier of fact." *People v. Kokoraleis*, 132 Ill. 2d 235, 264

(1989). So one witness cannot directly testify that another witness's testimony is untruthful or unreliable. See *id.* (defendant was asked "whether certain State witnesses were lying" when they testified contrary to defendant); *People v. Corral*, 2019 IL App (1st) 171501, ¶ 114 (expert properly barred from testifying that witness's identification of defendant was unreliable).

¶ 100   But that does not mean that another witness's credibility is entirely off-limits. Adversarial presentation would mean little if one side could not challenge the credibility of the other side's proof. A witness may certainly testify that the facts at hand are inconsistent with evidence, testimonial or otherwise, put forth by the opposing side. To hold otherwise would be to say that plaintiffs were simply required to accept as fact the testimony from the officers (at least Officers Susnis and Ryan) that they believed the occupants of the vehicle were armed and dangerous.

¶ 101   Here, Drago was saying the *actions* of the officers—the way they conducted the traffic stop—were not consistent with officers who believed they were stopping dangerous individuals within the car. Nothing in the rules of evidence or case law would prohibit that testimony.

¶ 102   But the line of questioning continued, after the court overruled the objection:

"Q. Would the fact in how they conducted that felony stop, does that come into your formulation of your opinions as to whether or not they believed that there had been a shooting committed when they started a chase?

[DEFENSE COUNSEL]: Objection.

THE COURT: Sustained."

¶ 103   That objection, in contrast, was properly sustained, because counsel was directly asking Drago for his opinion on "whether or not [the officers] believed there had been a shooting." This, Drago could not properly say. Shortly thereafter, Drago testified as follows:

"A. So you see the officers are already moving up towards the car away from any cover, which is totally contrary to what you do if you believe that these people are armed and dangerous and—

[DEFENSE COUNSEL]: Objection, motion—

[PLAINTIFF'S COUNSEL]: He's talking about the actions of—

THE COURT: It will be sustained as it relates to belief that individuals were armed and dangerous.

Q. Let me ask the question this way: The actions of the officers, is that consistent with officers approaching a vehicle when they believe shooting—a shooting had occurred?

A. No, it's not."

¶ 104   This block of testimony, in our view, was proper. Again, an expert testifying that an officers' actions are inconsistent with how they would normally act if they believed the occupants of the car were dangerous is not objectionable. It is not the same as directly calling the witnesses untruthful. Directly opining that the officers did not actually believe the occupants were dangerous, on the other hand, is improper, as the witness is expressly calling the officers' testimony untruthful. (To say nothing of lacking foundation.)

¶ 105   And it would be particularly unfair to deny plaintiffs this line of questioning, given that the court did not allow the expert to give his opinion on reasonable suspicion. Plaintiffs should not be denied every avenue of attack on this question, should they choose to pursue it on retrial.

¶ 106                                    CONCLUSION

¶ 107   The judgment of the circuit court is affirmed.

¶ 108   Affirmed.

*Harrell v. City of Chicago*, 2025 IL App (1st) 240119

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 17-L-10177, 18-L-6323; the Hon. Toya T. Harvey, Judge, presiding. |
| **Attorneys for Appellant:** | Lynn D. Dowd, of Naperville, and Zane D. Smith and Boris G. Samovalov, of Zane D. Smith & Associates, Ltd., of Chicago, for appellants. |
| **Attorneys for Appellee:** | Mary B. Richardson-Lowry, Corporation Counsel, of Chicago (Myriam Zreczny Kasper, Suzanne M. Loose, and Daniel E. Alperstein, Assistant Corporation Counsel, of counsel), for appellees. |